ELIZABETH SHEEHAN, as Administratrix, etc., Appellant, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Respondent.

S., plaintiff's intestate, was fireman upon an engine drawing a train, " No. 337," going west, on a branch of defendant's road, the business of which was prosecuted over a single track. The train was known as a " wild cat " train ; *i. e.*, one running irregularly, without reference to schedule or the regular trains, and moving by special orders. A regular train, " No. 50," was due at Cayuga, going east, according to schedule, at 4:40 P. M., and would leave at 4:45. Train " 337 " was then at Auburn, and at 4:46 the superintendent of the road telegraphed from Rochester to its conductor and engineer : " Wild cat to Cayuga regardless of No. 50 ; 12," the numerals at the end meaning " answer how understood." The rule of defendant in regard to the movement of trains by telegraph required the order to be first copied by the operator at Auburn in an order book and repeated back to the dispatcher, and after receiving back a message " O. K.," said operator was required to copy on a blank for the conductor and engineer, who, after comparing it with the book and seeing it was correct, were required to sign their names in the book prefixed by " 13," meaning : " We understand," which numeral with the signatures the operator was required to transmit to the dispatcher, who, thereupon, was to repeat the

order.  All of this was done, and train " 337," according to such order, left Auburn.  No communication was sent by the superintendent to the conductor or engineer of train " 50 " in regard to the movements of train " 337," but at 4:10 he telegraphed to K., the operator at Cayuga, to hold " No. 50 " for orders, which he received and repeated back.  K. said to the conductor of " 50 : "  " Hold No. 50 for 61," without exhibiting or delivering any message, and no rule or order of defendant required him to do so. There was a rule that " whenever any agent or operator receives an order to hold any train  *  *  he must carry out the order strictly."  " 61 " was a train going west ahead of " 337 ; " it came in soon after, whereupon " 50 " started out, and collided with " 337," and S. was injured.  In an action to recover damages the court submitted to the jury the question whether " the defendant had omitted the doing of any thing which it ought reasonably to have done to prevent the casualty."  *Held* no error ; that having ordered " 337 " to travel on the time of ''50," defendant was bound to exercise every reasonable precaution that the latter should not leave Cayuga before the arrival of the former ; and that its failure to communicate direct with the conductor and engineer of ''50 " presented a question for the jury.

*Slater* v. *Jewett* (85 N. Y, 61; 39 Am. Rep. 627), distinguished.

(Argued January 26, 1883; decided February 9, 1883.)

APPEAL from order of the General Term of the Supreme Court, in the fourth judicial department, made October 28, 1881, which set aside a verdict in favor of plaintiff and ordered a new trial.

This action was originally brought by Dennis Sheehan, the present plaintiff's intestate, to recover damages for injuries received by him in a collision of two trains on the Auburn branch of defendant's road.  During the pendency of the appeal to this court Sheehan died and the present plaintiff was substituted.

The material facts are stated in the opinion.

*William S. Oliver* for appellant.  It is not indispensable· that the particular circumstances relied upon to prove a fact should be contradicted in order to dispute the fact itself.  If other facts appear in the case in antagonism with the alleged fact, it is the province of the jury to determine whether the fact is proved.  (*Hazman* v. *Land Co.*, 50 N. Y. 53; *Bevier*

v. *D. & H. C. Co.*, 13 Hun, 257.) The facts proved entitled plaintiff to recover. (*McLallen* v. *R. R. Co.*, 84 Ill. 109 ; *R. R. Co.* v. *Henderson*, 37 Ohio St., 549 ; 67 Penn. St. 314; *Greenleaf* v. *R. R. Co.*, 29 Iowa, 47 ; *Keegan* v. *Kavanaugh*, 62 Mo. 230 ; 74 Penn. St. 223 ; 61 id. 58 ; *Patterson* v. *R. R. Co.*, 76 id. 389 ; *Clarke* v. *Holmes*, 7 Hurlst. & Norm. 937 ; *Snow* v. *R. R. Co.*, 8 Allen, 441 ; 44 Md. 283 ; *Newson* v. *R. R. Co.*, 29 N. Y. 390 ; *Flike* v. *R. R. Co.*, 53 id. 556 ; *Fuller* v. *Jewett*, 80 id. 46 ; *Slater* v. *Jewett*, 85 id. 61 ; *Hough* v. *R. R. Co.*, 10 Otto, 213–217 ; *Ford* v. *R. R. Co.*, 110 Mass. 241 ; *Bradley* v. *R. R. Co.*, 62 N. Y. 99–104 ; *Booth* v. *R. R. Co.*, 73 id. 38–41.)

*W. H. Adams* for respondent. Plaintiff cannot recover, for the reason that this accident is one of the risks and dangers incident to the employment of her intestate, and one which he assumed in entering upon or remaining in such employment. (*Wright* v. *N. Y. C. R. R. Co.*, 25 N. Y. 562 ; *Warner* v. *Erie Railway Co.*, 39 id. 468 ; *Haskins* v. *N. Y. C. & H. R. R. Co.*, 65 Barb. 129 ; affirmed, 56 N. Y. 608 ; *De Forrest* v. *Jewett*, 88 id. 264.)

DANFORTH, J. As between servant and employer, the latter is bound to use reasonable care in the prosecution of the business in which he engages the former, and it cannot be made out upon principle, or from any case of authority, that he shall not be liable for damages arising from a failure to do so. (*Laning* v. *N. Y. C. R. R. Co.*, 49 N. Y. 521 ; 10 Am. Rep. 417 ; *Cone* v. *Del. Lack. & West. R. R. Co.*, 81 N. Y. 206 ; 37 Am. Rep. 491 ; *Flike* v. *Boston & Albany R. R. Co.*, 53 N. Y. 549 ; 13 Am. Rep. 545 ; *Booth* v. *The Same*, 73 N. Y. 38 ; 29 Am. Rep. 97.) So, where the master delegates to another entire control over a particular branch or circumstance of his business, the person to whom such power is delegated stands in the place of the master as to all duties resting upon him to his servant, and his acts or omissions relative thereto are the acts or omissions of the master

himself. (*Flike* v. *Boston & Albany R. R. Co., supra.*)
These rules apply here. The relation of master and servant
existed between the defendant and Dennis Sheehan, and
the jury have found that his injuries were caused by
the omission of the defendant to provide against the event
which occasioned them; but their verdict has been set aside
in deference, it is said, to a decision lately made by this court
in *Slater* v. *Jewett* (85 N. Y. 61; 39 Am. Rep. 627). We
think that case has been misapplied. There the defendant
changed the time of the running of its train, but only after set-
ting in motion a series of operations designed to carry personal
notice to its employee of the intended change and bring to the
master an acknowledgment in writing that he had received
notice of it. The rule which required these precautions, pro-
vided for all supposable contingencies, but they failed by reason
of the omission of duty of a fellow-servant. Not so here. The
rules of the defendant imply the necessity of care similar to
that taken in the case cited, but they do not extend to such an
emergency as put the plaintiff in danger, and were inadequate
for his protection. The business of the defendant was
prosecuted over a single track railway by means of regular
trains moving at times prearranged and noted on cards or time
tables, and also by occasional trains moving without prearrange-
ment, but by special order without reference to any schedule
or the regular trains, and, conforming to no conditions save
the immediate order of the owner, were styled " wild " or
" wild cat." Train " 50 " was of the first, and train " 337 "
of the latter kind. · The plaintiff Dennis Sheehan, was fireman
on its engine. The terminal stations, so far as any question
here is concerned, were Auburn at the east, and Cayuga at the
west. Train " 50 " was due at Cayuga from the west, accord-
ing to the schedule, on the 22d of August at 4:40 P. M., and
would go east at 4:45. Train " 337 " was at Auburn, and at
4:46 the superintendent of the road telegraphed from Rochester
to the conductor and engineer of the train, " wild cat to
Cayuga regardless of No. 50. 12, G. H. B." It was shown that
the numeral " 12," at the end of the order, means " answer

how understood," and " G. H. B." were the initials of the
superintendent of the road. The rule of the defendant then
in force, relating to the "movement of trains by telegraph,"
required this order to be first copied by the operator at Auburn
in an order book provided for that purpose, and repeated back
to the dispatcher, " to be sure " (as the rule says) " it is cor-
rect." After receiving from the dispatcher a message " O. K.,"
the operator was required to make a copy on a blank for the
conductor or engineer, the persons addressed, " who will " (the
rule requires), " after comparing it with the book and seeing it
is correct, sign their names to the book prefixed by the numeral
' 13.' " Thereupon the operator must transmit the " 13," ac-
companied by the signatures of the persons addressed, to the
dispatcher. The numeral " 13 " signifies " we understand,"
and is followed by a repetition of the order. In this instance
the conductor and engineer of " 337 " answered " we under-
stand : wild cat to Cayuga regardless of No. 50." Here there
was full and perfect communication between the parties;
nothing was left to the discretion of either the operator or the
train-men, nor was either permitted to exercise an independent
judgment as to the meaning of the order or its delivery. Every
thing was precise and notice brought home to the persons to
be affected. But it is obvious from what has already been
stated, that this order entailed upon train " 337 " and its hands,
certain destruction from " No. 50," unless the movement of
the latter train was stayed. We should expect, therefore, in
view of the practice so minutely applied to " 337," that similar
preventive measures would have been applied to " No. 50,"
and as its time had been given to " 337," and its right of way
appropriated, that its conductor and engineer would have been
informed of those facts; but nothing of the kind was done.
No communication was sent to those persons, no rule of de-
fendant required it, and they were in fact left in absolute
ignorance that train " 337 " was to move on their time, or that it
was to move at all. But the defendant had a telegraph oper-
ator at Cayuga by name Kieffer, and at 4:10 the superintend-
ent telegraphed from Rochester as follows: " To W. F.

Kieffer, Cayuga. Hold No. 50 for orders. 12, G. H. B."
Kieffer acknowledged the message, saying, "I understand to
hold No. 50 for orders." Train "5" then came in going west,
and afterward "No. 50" at 4:35 or 4:40. As "No. 5" was
about leaving, Kieffer met the conductor of train "50" be-
tween train "5" and train "50," and said to him "hold No.
50 for 61." He neither exhibited nor delivered any message;
he said nothing else. No rule or order of the defendant re-
quired him to do either. "61" came in soon after, and "50"
started out toward Auburn. In a few moments it collided
with "337," and hence the plaintiff's injuries. Kieffer was
employed to receive and deliver messages and send them when
required. No order was given him to deliver the message he
received on this occasion, and he was not informed in regard
to train "337." He says he "was stationed there to com-
municate orders of the road from the dispatcher — was his
messenger." Examined by the defendant and asked, "what
were your general instructions?" says, where messages were
directed to the conductor and engineer "I deliver them,"
where directed to me, it was my "duty to tell them what it
read."

It was not disputed at the trial, nor is it upon this appeal, that
the dispatching of train "337" — wild cat — and the holding
of train "50", were within the province of the superintendent,
nor that, in respect thereto, he represented the defendant in
its corporate capacity. Clearly he held that relation; but
another rule of the defendant, printed under the same general
heading as the other, was put in evidence, and is called by the
respondent to our attention, viz.: "When an agent, or
operator receives an order to hold any train, for any purpose,
he must carry out the order strictly. Conductors and engine-
men will respect and comply with the same in all cases."
These facts appeared upon the trial, and the learned trial
judge, although moved thereto by the defendant, refused to
nonsuit, and gave the case to the jury as one in which they
might inquire, "whether the defendant had omitted the doing
of any thing which it ought reasonably to have done, to

prevent the casualty which resulted in the plaintiff's injury." In this there was no error. Having ordered " 337 " to travel on the time of " 50," the defendant was bound to exercise every reasonable precaution that train " 50 " should not leave Cayuga before the arrival of " 337." No reason is given for not communicating with the conductor and engineer of train " 50 " before it reached Cayuga, or at least on its arrival there. The defendant annulled its time table — made it imperative upon " 337 " to move in spite of the prearranged right of " 50," and not only omitted as to " 50," the exceedingly proper and wise conditions on which alone " 337 " was permitted to obey, but failed to send any communication, whatever, to " No. 50." Its omission to do so not only defeated all previous precautions, but converted them into means of destruction. The object should have been to prevent train " 50 " from running according to the time table. To secure certainty in that respect, the defendant should have so communicated with its conductor and engineer that these servants would understand the object. It is plain that the mode of communicating, already adopted with " 337," was ample and effectual. Two parties only were involved, the master and its servants upon the train, and the only hazard was disobedience or forgetfulness on the part of those servants. In the method adopted another event was introduced, upon which the first was made dependent. Instead of communicating with the engineer and conductor, the defendant communicated with a third person — the telegraph operator, and told him to " hold the train for orders." The train was made subject to his will, and the object in view became dependent upon his memory, and his faithfulness in obeying the order, and the probabilities of its attainment were thereby lessened.

It cannot be said, therefore, as matter of law, that the defendant so dealt with the problem before it, as not to expose the plaintiff — its servant, to perils against which he might have been guarded by proper diligence, on its part, and, as matter of fact, the jury might well find that it did not take such reasonable care to protect him from accident, as the exigencies

of the situation required.   Indeed, the evidence shows that he was needlessly put in a place where injury was made inevitable, by the direct interference of the defendant.

It is one thing for the orders of the master to go by report, or hearsay to the servant, and quite another when they are received by him directly, and without an intervener.   In the first they are liable to be conceived wrong, and repeated untruly, as was the case in this instance, while in the last such mistake is at least improbable.   The law does not exact absolute certainty, but when life is at stake, it demands that care shall be taken to provide so far as possible against all contingencies, and whether the importance of a right understanding of the order, actually given, as to train " 50," required that one mode of communication, rather than another, should be adopted, was for the jury to say.   Among other facts they could consider that the effect of starting train "50" on its prescribed time was as well known to the defendant when it directed "337" to move, as it was after the collision.   That event came from no cause of the existence of which it was ignorant, but from one which it might have controlled.   The defendant had created the exigency, and was bound, in some practicable way to adjust the running time of train "50" to it, and for the consequences of the omission of any reasonable act, tending thereto, it was liable.   It was not enough to tell Kieffer to hold the train.   The duty of holding it devolved upon the defendant, and its breach was not excused by showing that it would have been held if Kieffer had performed his duty.

It is argued, however, by the respondent's counsel that the plaintiff took the risk of defects in the defendant's system of running trains by telegraphic orders.   There are cases where such an argument might apply, but I am not aware of any principle which releases the master from liability to an employee who has been injured by the very act of his employer, or by the omission, on its part, to provide rules which, faithfully carried out, would ensure safety.   There was no such bargain between the parties, and public policy forbids

that one should be implied.    Moreover the question raised by the defendant, was, at the request of his counsel, submitted to the jury, and they found that the plaintiff neither knew, nor had the opportunity of knowing, the methods employed by the defendant in running its trains by telegraphic orders, but, however the fact might be, the peremptory order of the superintendent to go forward, regardless of "No. 50," was an assurance that the track would be free and safe for the journey, and required the defendant to take reasonable precautions to make it so.    The rules of the defendant did not require Kieffer to submit the message, received by him, to the conductor or engineer of train "50," nor a communication back from those persons, that they had received, and understood the order; an omission of either circumstance was the act of the defendant, and in the absence of other precautions, might properly be held to constitute negligence.    The jury have found, upon sufficient evidence, that such precautions were not taken.

It follows that the case was well disposed of at the trial, and the plaintiff should have judgment on the verdict.    Therefore, the order of the General Term is reversed, and judgment ordered upon the verdict, with costs.

All concur.

Ordered accordingly.