## EDGE v. SOUTHWEST MISSOURI ELECTRIC RAILWAY COMPANY, Appellant.

### Division Two, July 13, 1907.

1. **NEGLIGENCE: Fellow-Servant: Car-Dispatcher.** A railway employee who is vested with the control of the running of cars is a vice-principal. Consequently, a car dispatcher who gave orders over a telephone to conductors of cars on a single-track electric railway as to where the cars should side-track to meet other cars coming in the opposite direction, was not a fellow-servant of either the conductor or motorman. And where a car dispatcher is negligent in that regard, it is the master's negligence.

2. ———: **Vice-Principals.** Whether the agent be a superintendent, general manager, train dispatcher, car dispatcher, foreman or boss, if to him has been delegated the performance of the personal duties which the master owes to his employee, for the negligent performance of that duty which results in an injury to that employee the master is liable in damages.

3. ———: **Car-Dispatcher: Erroneous Order: Collision.** Where there is substantial evidence that the car dispatcher gave an erroneous order to the conductor of a car on a single-track electric railway, to move on to another station to meet a car in-

stead of to wait where his car was, and as a result the motor-man was injured by a collision between the two cars, there is a case for the jury.

4. ———: ———: ———: ———: **Jumping From Car.** And in this case, where the cars were running from twenty-five to thirty-five miles an hour, and were not seen by their respective motormen until within one hundred and fifty to two hundred feet of each other, the plaintiff motorman was not guilty of con-tributory negligence in jumping from the car.

5. ———: ———: .Act of 1897: **Street Railway.** Where the petition alleged and the evidence showed that defendant was a corporation engaged in the operation of an electric railway be-tween the city of Carthage, Missouri, and the city of Galena, Kansas, a distance of thirty or thirty-five miles, and that the road passed through twelve or fifteen towns or stations, among them Webb City, Carterville and Joplin in the State of Mis-souri, and there was no denial of that allegation, there is no pleading on which to base a holding that the Fellow-Servant Law of 1897 did not apply to defendant, nor would it be held, had that law been invoked by the pleadings, that defendant was a street railway or that it was exempt from the operation of .that act. It was not a street railway within the meaning of that act.

6. ———: **Car-Dispatcher: Repeating Order Heard By Others: Hearsay.** Where the conductor testified that when his car ar-rived at Morgan he called up the car dispatcher by telephone and reported his car was at Morgan, and was instructed by the car dispatcher to meet a car coming from the other direction at Syracuse and that he repeated the order back to the car dis-patcher just as he received it, it was not error to permit three other witnesses to testify, in corroboration of the conductor, just what they heard him repeat back to the car dispatcher, who tes-tified that the order was to meet the other car at Morgan. Their evidence was not hearsay.

7. ———: **Amending Petition After Evidence In: Surprise.** An amendment, after the introduction of all of plaintiff's evidence, consisting simply in changing an allegation in the original pe-tition stating plaintiff was injured by the collision of the cars to an allegation that he jumped from the car when he saw his po-sition was perilous, did not change the issues, and gave de-fendant no right to have the case continued on account of sur-prise, the gist of the cause of action being the negligence of the company in giving conflicting and erroneous orders as to the movement of the car.

8. ———: **Evidence: Photographs.** Photographs showing the physical conditions existing at the time of the accident and throwing light upon the rate of speed the cars were moving at the time of the collision, are proper evidence.

Appeal from Jasper Circuit Court.—*Hon. Jos. D. Perkins,* Judge.

AFFIRMED.

*McReynolds & Halliburton* for appellant.

(1) The court erred in admitting any evidence under the petition in this cause. (a) The Fellow-Servant Law of 1897 did not apply to street railroads. Sams v. Railroad, 174 Mo. 53; Funk v. Railroad, 61 Minn. 436; Lundquist v. Railroad, 65 Minn. 387; Riley v. Galveston, 13 Tex. Civ. App. 247. (b) Havens (car dispatcher or starter) and plaintiff were fellow-servants, and defendant is not liable for negligence (if any) of Havens. Railroad v. Dwyer, 57 Ill. App. 440; Thompson v. Railroad (Ind.), 53 N. E. 462; Murray v. Railroad, 98 Mo. 575; Sams v. Railroad, 174 Mo. 63. (2) The court erred in permitting witnesses to testify as to what they heard the conductor Moad say at the telephone at Morgan's switch; it was not a part of the *res gestae,* took place before the accident and was hearsay, pure and simple, and self-serving, to support his evidence as against defendant's witnesses, Havens and Harbaugh. Koenig v. Railroad, 173 Mo. l. c. 721. The intention and effect of the evidence was to corroborate Moad by his own statements previously made, which is certainly not permissible, and if Moad's statements are inadmissible when made after the accident, they are certainly inadmissible when made before the accident and do not form a part of it. Barker v. Railroad, 126 Mo. 143; Senn v. Railroad, 108 Mo. 142; Richenberg v. Railroad, 161 Mo. 70. (3) Error was committed by the court permitting plaintiff, over defendant's objection, to put in evidence the four pictures taken by photographer Head of the two cars some hours after the accident, as they certainly did not tend to prove or disprove any issue in the case. Their

only effect possible would be to prejudice the jury, and were wholly irrelevant to the issue. Also in permitting witnesses to testify as to condition of cars after the collision for the same reasons. Hart v. McNeil, 47 Mo. 525; Nelson v. Preismeyer, 30 Mo. App. 126; Paddock v. Somes, 51 Mo. App. 320. (4) The court erred in permitting plaintiff to amend his petition after the close of his evidence without imposing terms upon him and in overruling defendant's affidavit of surprise and application for continuance on account of the amendment. (a) The variance between the allegations of the original petitions and the proof offered by plaintiff was material and fatal to plaintiff's recovery, and defendant's instruction at the close of plaintiff's evidence to find for defendant should have been given on the original petition and evidence. Chitty v. Railroad, 148 Mo. 64; Crawford v. Aultman, 139 Mo. 262; Cole v. Armour, 154 Mo. 333; Feeback v. Railroad, 167 Mo. 206. (b) For the same reasons the court erred in permitting plaintiff after showing that he jumped from the car to prove the extent and character of his injuries before filing amended petition, as the charge and proof were entirely different. Weil v. Posten, 77 Mo. 284; Thompson v. Railroad, 135 Mo. 217. (c) The amendment of the petition being in a material matter and one necessary to be made before he could recover, the court should have continued the case on defendant's affidavit of surprise. R. S. 1899, sec. 655; Wells v. Sharp, 57 Mo. 56; Fischer v. Max, 49 Mo. 404; Turner v. Railroad, 51 Mo. 509. (d) The amendment made by plaintiff was a material change of the cause of action; on the first petition and evidence he was not entitled to recover and under the amendment defendant should have been granted a continuance. Chitty v. Railroad, 148 Mo. 73; Litton v. Railroad, 111 Mo. App. 144; Hensler v. Stix, 113 Mo. App. 175.

*Howard Gray* and *Patterson & Patterson* for respondent.

(1) Notwithstanding it was our opinion that on principle the Fellow Servant Act of 1897 applied to street and interurban electric railways, this case, because of a prior recent decision of our Supreme Court, was tried on the theory that the Act of 1897 did not apply. Where a servant is entrusted with the performance of one of his master's personal duties, he is with respect to that duty a vice-principal or representative of the master, who will be liable to another servant for the negligent performance by the vice-principal of the delegated personal duty, to the same extent as for his own negligence. 12 Am. and Eng. Ency. Law (2 Ed.), 946. The car dispatcher, Havens, having full and absolute control over all the men operating the cars on the road of defendant, was not a fellow-servant but a vice-principal. Smith v. Railroad, 92 Mo. 359; Jones v. Railroad, 178 Mo. 359; Bien v. Railroad, 108 Mo. App. 399; Railroad v. Barry, 25 L. R. A. 389; Tedford v. Railroad, 54 L. R. A. 91; Mast v. Kern, 75 Am. St. Rep. 639; Weldon v. Railroad, 93 Mo. App. 668; Zellars v. W. & L. Co., 92 Mo. App. 107. It has long been established that a railroad company as a master owes to its employees the duty of keeping its road and track in such condition as to secure the safety of its servants who are required to work and be thereon. This duty it can not delegate to any servant high or low so as to escape liability. Schaub v. Railroad, 106 Mo. 87; Lewis v. Railroad, 59 Mo. 495; Hall v. Railroad, 74 Mo. 298; Siela v. Railroad, 82 Mo. 435; Ogelsby v. Railroad, 177 Mo. 130; Dutzi v. Geisel, 23 Mo. App. 689; Steube v. Foundry Co., 85 Mo. App. 647; 12 Am. and Eng. Ency. Law (2 Ed.), 968; Railroad v. Camp, 65 Fed. 952; Lewis v. Seifert, 2 Am. St. Rep. 631; Hunn v. Railroad, 44 N. W. 502; Crew v. Railroad, 20 Fed. 87; Hankins v. Railroad, 92 N. Y. 39; Sheehan v. Railroad,

91 N. Y. 342; Slater v. Jewett, 85 N. Y. 62; Darrigan v. Railroad, 52 Conn. 285; Railroad v. Barrie, 23 S. W. 1097; Railroad v. McLallen, 84 Ill. 109; Railroad v. Arispe, 5 Tex. Civ. App. 611; Smith v. Railroad, 92 Mo. 359. (2) Both the conductor and the dispatcher testified that Moad repeated the identical order given him, and therefore what he repeated was the order given, and it was competent to prove what he repeated by the passengers and the motorman. Crowther v. Gibson, 19 Mo. 365; Strode v. Conkie, 105 Mo. App. 12; State v. Gabriel, 88 Mo. 631; Randolph v. Railroad, 18 Mo. App. 609. Where the making of a declaration either oral or in writing and not its truth or falsity is the fact in issue, such declaration is itself the *res gestae* and is always admissible. 24 Am. and Eng. Ency. Law (2 Ed.), 664; U. S. v. King, 34 Fed. 314; Railroad v. O'Brien, 199 U. S. 99; Leahy v. Railroad, 97 Mo. 172; Insurance Co. v. Sheppard, 12 S. E. 18; Harriman v. Stowe, 57 Mo. 93; Stevens v. Walpole, 76 Mo. App. 220; State v. Hudspeth, 159 Mo. 178.

BURGESS, J.—This suit was brought in the circuit court of Jasper county by W. A. Edge against the defendant for the recovery of the sum of $25,000 for personal injuries received by him in jumping from a car, caused by the alleged negligence of defendant in permitting a collision to occur on its road between two of its cars.

For his cause of action, the plaintiff states that the defendant is now, and at all times hereinafter mentioned was, a corporation organized and doing business under the laws of the State of Missouri; that as such corporation, it is now, and at all times hereinafter mentioned was, engaged in the operation of an electric railway between the city of Carthage, Missouri, and the city of Galena, Kansas, running through the cities of Joplin, Webb City, and Carterville, Missouri; that the railway of defendant has now, and at all times

hereinafter mentioned had, a great many short and
abrupt curves, and many of said curves are in deep
cuts and around embankments and groves of trees, so
that the employees of defendant in charge of and ope-
rating its cars can see only a short distance ahead, when
about to round, and when rounding said curves with
the cars of defendant, and so that cars approaching
each other on said track cannot be seen by the men in
charge thereof until they get within a very short dis-
tance of each other; that the defendant requires its
employees in charge of and operating its said cars to
make and maintain a certain schedule of time, to-wit,
about fifteen or sixteen miles an hour; that in order to
make and maintain said schedule, and to make the re-
quired stops at railroad crossings, and to allow passen-
gers to embark and disembark from said cars, and to
make other necessary stops in the operation of said
cars, it is necessary for the employees of defendant in
charge of and operating said cars to run the same at a
very rapid rate of speed while rounding the aforesaid
curves in the railway track of defendant, as well as
when running over a straight track, which facts are
well known to the defendant; that on the 17th day of
August, 1903, plaintiff was a motorneer, and Buren
Moad was a conductor, in the employ of defendant,
and in charge of car No. 30 of defendant's line, in tran-
sit from Carthage, Missouri, to Galena, Kansas; that
at said time another one of defendant's cars, in charge
of employees of defendant, was bound for the city of
Carthage, the Carthage-bound car being known as No.
29; that on August 17, 1903, Lawrence Havens was one
of the car dispatchers of defendant at its Webb City
office; that it was the duty of a car dispatcher to super-
intend, control and direct the employees of defendant
while engaged in the work of moving the cars over the
track of defendant's road, to give orders, by telephone,
to employees in charge of and operating cars of defend-

ant, at certain telephone stations along the railway of defendant, directing them as to when and where they should pass, with the cars of which they were in charge, other cars of defendant's which were running in opposite directions; and the said employees were bound to obey said orders; that it was the duty of a car dispatcher to transmit by telephone to said stations said orders, to the employees of defendant in charge of and operating its cars on its said railway, and to insure the correct transmission it was his duty to have the orders correctly repeated back by the employee receiving them; that said car No. 30 in transit from Carthage, Missouri, to Galena, Kansas, was stopped at Morgan station by the said employees of defendant in charge thereof for the purpose of receiving orders by telephone from the car dispatcher of defendant at its Webb City office; that it was the duty of the conductor in charge of a car of defendant to receive the said orders at the telephone stations, aforesaid, repeat them back, and when approved by the car dispatcher, to transmit the said orders to his motorneer; that pursuant to and in performance of that duty, Conductor Buren Moad of said car No. 30, entered the telephone station of defendant at Morgan station for the purpose of receiving orders; that at said time, Lawrence Havens was acting as the car dispatcher for defendant; that the said Lawrence Havens carelessly and negligently transmitted to the said Buren Moad an order for car No. 30 to pass car No. 29 at Syracuse, look out for car No. 17 at Lakeside, and go to Motley; that at that time, car No. 29 was in transit over the same line of track for Carthage, Missouri, with orders from defendant's car dispatcher to pass car No. 30 at Morgan station; that because of said careless, negligent and conflicting orders, said car No. 30 in transit to Motley, pursuant to said orders, when it was about to round one of the curves of defendant's line about

a mile west of Morgan station, where it was impossible to see an approaching car more than 150 to 200 feet ahead, and when plaintiff was in the exercise of due care, collided with said car No. 29; that because of said collision plaintiff was seriously and permanently injured, in that his right knee-cap was split, and in that the muscles and ligaments of his left arm were torn and lacerated to such an extent as to permanently impair its use, and the scapula on the left shoulder broken down to the extent of an inch and a half, and in that several of the processes of the spine at the base of the neck were broken off, and the spinal cord so injured as to seriously impair plaintiff's ability to turn his head, and in that he received severe scalp wounds above the forehead, and another near the base of the brain, and in that his skull was crushed on the right side near the median line above the nervous center of the brain, thereby necessitating the removal of a piece of the skull two inches in diameter, leaving the brain exposed and unprotected; that because of these injuries plaintiff is partially paralyzed in the left side, and has suffered, and will continue to suffer great pain and has been, and will be for the remainder of his life disabled from the performance of manual labor, his only means of obtaining a livelihood; that by reason of the above injuries, the plaintiff's sanity is greatly endangered, and total paralysis is a constant menace.

Plaintiff further states that his time on and prior to August 17, 1903, was worth not less than fifty dollars a month, and that by reason of his injuries, as aforesaid, he has lost the value of his time from August 17, 1903.

Wherefore, in consideration of the premises, plaintiff is damaged in the sum of twenty-five thousand dollars, for which he prays judgment.

At the close of plaintiff's case, defendant offered a demurrer to the evidence, which was, by the court

refused, and defendant excepted. Plaintiff, thereupon, asked leave to file an amended petition. Defendant objected to the filing of the amended petition, for the reason that it stated a different cause of action from the cause of action alleged in the original petition, and because defendant was not prepared to meet the allegations of the petition as amended, which objection was, by the court, overruled, and defendant excepted. The plaintiff was permitted to file an amended petition, which was in all respects the same as the original, with the exception that instead of stating that car No. 30 collided with car No. 29, and because of said collision he was seriously and permanently injured, he alleges, "That said collision was imminent and pending, and plaintiff had reasonable cause to believe said collision was inevitable, and having cause to apprehend great personal harm by reason thereof, jumped and was injured," etc.

Defendant then filed an affidavit of surprise, and stated it was not prepared to meet the new issues made by the amended petition, and asked for a continuance, which was, by the court, refused, and defendant excepted.

Defendant then filed its amended answer, which, omitting formal parts, is as follows:

"Now comes the defendant and for answer to amended petition of plaintiff herein, admits that the defendant is now, and at all times hereinafter mentioned in plaintiff's petition was, a corporation organized and doing business under the laws of the State of Missouri, and was engaged in the operation of an electric railway between the City of Carthage, Missouri, and the City of Galena, Kansas, running through the cities of Joplin, Webb City and Carterville, Missouri. Admits that on the 17th day of August, 1903, plaintiff was a motorman and Buren Moad was a conductor on one of defendant's cars and in charge of car No. 30 of

defendant's line, in transit from Carthage, Missouri, to Galena, Kansas, and denies each and every other allegation in plaintiff's petition contained.

"Defendant further answering says that the injuries, if any, received by plaintiff were caused by the negligence of plaintiff and the negligence of his conductor, Moad, who was a fellow-servant. That plaintiff was negligent and careless in running his car around the curve at Dewey station at too fast a rate of speed and was negligent and careless in not keeping a lookout for objects on the track ahead of him, and negligent and careless in talking and carrying on conversation with other people and not giving his full attention to his duties as a motorman, and that but for the negligence and carelessness on the part of plaintiff he would have seen car No. 29 in ample time to have prevented any collision between said cars. That said conductor Moad, a fellow-servant of plaintiff, was negligent and careless in receiving his orders from Lawrence Havens, car-starter, and in misunderstanding and mistaking his orders. That said Lawrence Havens ordered him to meet 29 at Morgan and go to Motley, and that said Moad negligently and carelessly failed to obey said order and left Morgan station with 30 without waiting for car 29 to arrive there.

"Defendant further answering says that Lawrence Havens, car-starter, and plaintiff were fellow-servants and both engaged in the operation of said car No. 30 of defendant company, and defendant is not liable for any mistakes or negligence of said Lawrence Havens, if any there were. That plaintiff, if he had been attending strictly to his duties, and looking out for objects ahead of him on the track of said road, would have seen car No. 29 in ample time to have stopped his car No. 30 before any collision occurred. The plaintiff

had ample time after he did see car No. 29 to have so checked and stopped car No. 30 and that no collision would have occurred, or if any had occurred it would have been so slight as to cause no injury; that plaintiff instead of performing his duties on said car, immediately on sight of car No. 29 abandoned his post of duty and made no attempt to stop said car No. 30, and negligently and carelessly failed to perform his duties as motorman in attempting to stop said car, and negligently and carelessly failed to use the means he had at hand to stop his said car, or to attempt to stop his said car, all of which plaintiff could have done with ordinary care and attention to his duty.

"And defendant says that collision between said cars was caused by the negligence of plaintiff in failing to perform his duty in keeping a lookout for objects on the track and running around Dewey curve at too rapid rate of speed and carrying on conversation with other people on said car instead of keeping his attention directed ahead of him on the track of said road, by reason of all of which defendant says plaintiff is not entitled to recover in this cause; that the accident and injuries, if any, received by plaintiff, were caused by the negligence and carelessness of plaintiff as above set out, and if there was any negligence on the part of Buren Moad, conductor, and Lawrence Haven, car dispatcher, said negligence was the negligence of a fellow-servant of plaintiff, and plaintiff is not entitled to recover in this action.

"Defendant having fully answered, asks to be discharged with costs."

The reply was a general denial.

The facts disclosed by the record are but few, and are, substantially, as follows:

On August 17, 1903, the defendant was operating a single-track railway between Carthage, in this State, and Galena, in the State of Kansas, a distance of thir-

ty or thirty-five miles.   Carterville, Webb City and
Joplin are on the road, and between Carthage and
Galena.   There were some eight or ten cars operated
over said road, and the service was one about every
thirty minutes.   The company maintained a general
office at Webb City, in which it employed two car dis-
patchers, one named T. A. Harbaugh, and the other
Lawrence Havens.   The former served from sometime
in the forenoon to three o'clock p. m., when he was
relieved by the latter, who performed the duties of the
position for the balance of the day.   The company had
some twelve or fifteen switches, or sidetracks, between
Carthage and Joplin, on which the cars going in oppo-
site directions passed each other.   At most, if not all,
of those switches there was a telephone maintained
and used by the defendant as its telephone system.
These telephones were connected with the office of the
car dispatcher, at Webb City.   The cars were number-
ed and the mode of operating them was as prescribed
by a rule of the company, which is as follows:

"10.   Cars must be run as closely to schedule time
as possible, and each conductor must communicate, by
telephone, with the car dispatcher at time of leaving
car house and at each passing point and terminal
wherever there is a telephone, and must govern the
movement of his car strictly by orders received from
dispatcher, proceeding from station to station only
on orders.   He must not allow his car to go beyond any
meeting point without orders, whether he meet another
car or not.   When the cars meet the conductor of the
car first to arrive will report, and repeat orders, re-
ceived, to both his own motorman and conductor of
connecting car, and motorman of latter must not pro-
ceed until ordered or signaled so to do by his conduc-
tor.   No extra car or work-car must leave car house
without reporting to and receiving orders from dis-
patcher, and all such cars must move only in accord-

ance with orders received from dispatcher. Orders received at telephone must be repeated back to dispatcher and conductor should then keep his ear to phone for a moment to hear anything further that the dispatcher may have to say to him. Orders must not be shouted between passing cars. Each car must receive its own orders over 'phones unless both cars meet and are standing in front of 'phone when orders are given. When a telephone is out of order and orders cannot be obtained over it, both cars will proceed carefully to the nearest telephone and call for orders.''

At the time of the injury plaintiff was in the employment of the defendant as a motorman, and had charge of car No. 30, which left Carthage at 2:10 of the afternoon of that day on its regular trip. Buren Moad was also an employee of the company, and was the conductor in charge of that car at the time of the injury. When the car left Carthage, the conductor, Moad, called up the dispatcher and received orders to go to Morgan station, which was a station about three miles from Carthage. The car arrived there on time, and the conductor called, by 'phone, the dispatchers for orders. After the car left Carthage and before reaching Morgan, Harbaugh, one of the car dispatchers, went off duty, but remained in the office, and Havens, the other dispatcher, answered the telephone at Morgan. The last order Harbaugh gave before going off duty was for car No. 29, which was en route from Galena to Carthage, and which had arrived at the station Motley, about five miles west of Morgan, to proceed to Morgan, which was a regular place where it should have met car No. 30. That was the last order given by Harbaugh; and the first given by Havens after coming on duty, was to Conductor Moad when he called in at Morgan.

The telephone box is in the open and the car, while

the conductor is waiting for orders, stands within a few feet of the box.

Moad, over the objections of the defendant, testified that when he reached Morgan he called the dispatcher for orders, and that "Havens said, 'Hello,' and I said, '30 Morgan,' and he says, '30 pass 29 at Syracuse, look out for 17 at Lakeside. I don't know whether they are on the main track or not, but they are coming ahead of you, and you will then come on to Motley,' and I repeated the order back, and said, "30. pass 29 at Syracuse, look out for 17 at Lakeside—don't know whether they are on the main track or not, but they are coming ahead of you, and come on to Motley.' Havens said all right or something like that."

He also testified that he then boarded his car and gave the signal to go ahead, and walked to the front of the car and repeated the order to the motorman, and he said, "All right, we'll do it."

Moad's testimony was fully corroborated by the testimony of the plaintiff and three passengers who were on said car, who testified to hearing the words of Moad.

As soon as the signal was given the car proceeded toward Syracuse, which is a mile or so west of Morgan. Between Morgan and Syracuse there is a tract of land owned by one Ropp, and the car line, if it proceeded directly from Morgan, would pass through the Ropp land and cut a long narrow strip off of the south side thereof. To avoid that the road curved to the south and then passed down grade for a short distance to a point where there was rather a steep up-grade, and after reaching the top of the up-grade the track proceeded a short distance and then curved back to the north about the same distance it had curved to the south. The time between Morgan and Syracuse, including stops, was about five minutes. After plaintiff's car curved to the south and started back up-grade

on the curve to the north, the power was turned on, and the car was going from twenty-five to thirty-five miles an hour.

On the south side of the track of the Ropp land was a row of fruit trees, six or eight feet from the track, the limbs of which extended out to or near the passing cars. The plaintiff's evidence tended to show that cars meeting each other on said track as it makes the curve to the north could not have been seen on account of said curve and said trees, on the day of the injury, by the motorman, if standing at his post of duty on the front end of the car, for a greater distance than one hundred and fifty to two hundred feet; while defendant's evidence tended to show that it could have been seen from one hundred and fifty to nine hundred feet.

About the time car No. 30 reached the top of the grade mentioned, and while going from twenty-five to thirty-five miles an hour, car No. 29 came east from Motley, around the curve and from beyond the trees, at a rate of speed from twenty to thirty miles an hour. When No. 29 was first seen by plaintiff, the evidence tended to show it was somewhere between one hundred and fifty and two hundred feet away. He testified that he was looking down the track all the time and as soon as he saw the car he reversed his car and attempted to apply the brake, but, believing a collision was inevitable, he leaped from the car and received the injuries complained of. Almost instantly after he jumped the cars came together with terrific force, and killed the motorman on car No. 29, and injured some of and threw many of the passengers on both cars to the floor. After the collision occurred, plaintiff was found in an unconscious condition in the rear of car No. 30, from fifty to ninety feet therefrom, lying between the rails.

All the eye-witnesses testified that after the cars

first came in sight it was absolutely impossible to have prevented the collision, which is corroborated by the fact that the car was running from twenty-five to thirty-five miles an hour, and still it ran less than one hundred feet after he jumped, until it collided with the other car.

Plaintiff introduced in evidence several photographs of the cars and surroundings taken the same evening of the accident, over the objections of defendant.

Plaintiff's injuries consisted of a split knee-cap, left arm and shoulder knocked down, and the muscles thereof torn and strained, a fracture of the seventh cervical vertebra, one or two cuts on the shin, and a fracture of the skull. A piece of the temporal bone, as large as a silver dollar, had to be removed, and the brain at that point is protected only by the scalp, and at the time of the trial his arm and neck were stiff and he was unable to perform manual labor. He suffered great physical pain and mental anguish. The injury to the head is permanent.

He was receiving twelve and one-half cents per hour at the time of the injury.

Defendant's evidence tended to show that the run of the cars was kept by a board with two lines with holes marking the switches on the road — one for cars going west and one for cars going east, the position of the cars being marked by pegs, the pegs being changed from one hole to another as they reported and were started for such switch. That on the day of the accident Havens came on duty at 2:15, and he and Harbaugh were both on duty at the time of the accident, and Havens testified as follows: "The first call I got was at 2:25. I plugged in and said, 'Hello,' and got back a reply, '30 at Morgan.' I recognized the voice and said, 'Wait a minute Moad,' and pulled my plug. I hadn't received any instructions from the other dis-

patcher as to the position of the cars.  I called for information and when I received it I plugged back again and said, 'Hello Moad,' and he said, 'Hello,' and I said, 'Moad, Tom says (meaning Harbaugh), Tom says 17 is at Lakeside, but he doesn't know whether it is on main line or side track; you tell your motorman to look out for that,' and then I gave him orders, '30 will meet 29, look out for 17 at Lakeside and go to Motley.'  30 was to meet 29 where they had reported, which was at Morgan.  I had a repetition of the order from Moad."

Thomas Harbaugh fully corroborated Havens as to the orders given Moad by Havens, and explained the manner of keeping run of the cars.

Defendant also introduced evidence tending to prove that car No. 30 never slackened its speed after coming in sight of No. 29 up to the time of the collision; that No. 29 had nearly stopped at that time.

Defendant put in evidence rules 64, 66 and 86 of the company (of which it was shown plaintiff, as motorman, had a copy), which rules required motormen to enter and go around curves at a moderate rate of speed and to have car under good control on all grades, and requiring motormen to use due care and caution, and regulate speed to conform to the character of track, and no fast running to be indulged in except on open spaces of clear, straight track.

At the close of all the evidence, the defendant asked a peremptory instruction, directing the jury to find for it; also one declaring the conductor and plaintiff fellow-servants; both of which were refused by the court, and defendant duly excepted.

The court then by proper instructions, to the giving of which there were no objections, submitted the issues to the jury.

Among other instructions given for the defendant was the following:

"The court instructs the jury that if they believe from the evidence that the car dispatcher, Lawrence Havens, instructed conductor Moad when at Morgan station to meet car 29, look out for car 17 at Lakeside and go to Motley, and conductor Moad started car No. 30 from Morgan station without waiting for car No. 29 and the collision between cars No. 29 and 30 occurred, then such collision was caused by the negligence of conductor Moad, and defendant is not liable and your verdict will be for defendant."

The jury found for plaintiff and assessed his damages at the sum of $5,000, and judgment was rendered accordingly.

Having duly filed motions for a new trial and in arrest, which were overruled, defendant saved its exceptions and appealed to this court.

I. The defendant contends that the plaintiff should not be permitted to recover in this case, because:

First. The injury complained of was the result of the negligence of one Moad, and one Havens the conductor of the car on which plaintiff was motorman, and the car dispatcher, who were fellow-servants, and for whose negligence the company is not liable.

Second. That plaintiff was guilty of contributory negligence.

Third. The court erred in the admission and rejection of evidence.

Fourth. That the court should have given the defendant's demurrer to the evidence; and,

Fifth. The court erred in refusing an instruction asked by defendant, declaring Lawrence Havens and the plaintiff fellow-servants.

A duty rests upon railroad companies to establish and promulgate either by time tables or other suitable means appropriate and sufficient rules and regulations for the safe running of their trains, and an employee who is charged with this duty is with respect

to its performance a vice-principal. Consequently, it is held that a railroad employee who is vested with the control of the running of trains is a vice-principal. [12 Am. and Eng. Ency. Law (2 Ed.), 968.]

The undisputed facts are, the car dispatcher, whose office was at Webb City, had not only control of the plaintiff, but he had control of all the conduc- tors, and motormen, as well as the control and manage- ment of all the cars and their operation. There is a broad distinction between the relations that exist be- tween fellow-servants and that which exists between them and the vice-principal of the company.

In discussing this question, the Supreme Court of the United States said: ''There is a clear distinction to be made in relation to their common principal, be- tween servants of a corporation, exercising no super- vision over others engaged with them in the same em- ployment, and agents of the corporation, clothed with the control and management of a distinct department, in which their duty is entirely that of direction and superintendence.'' [Railroad v. Ross, 112 U. S. l. c. 390.]

And this court quoted the above language approv- ingly in discussing a like question, and added: ''In Sheehan v. Railroad, 91 N. Y. 332, and Railroad v. Mc- Lallen, 84 Ill. 109, the superintendent and assistant sup- erintendent acting as train dispatchers, were held to be vice-principals. In the case last cited it is said, that, as between the conductor and the company, the assistant superintendent, to whose orders the trains are all subject, is the representative of the corporation, and that the rule applies as well to all orders issued by his assistants and in his name.'' And, continuing, this court said: ''That a train dispatcher is to be re- garded as the representative of the company is, in effect, held in the following cases: Booth v. Railroad, 73 N. Y. 38; Railroad v. Henderson, 37 Ohio St. 552;

Washburn v. Railroad, 3 Head (Tenn.) 638; Darrigan v. Railroad, 24 Am. Law Reg. 453."

This court then concluded by holding that a train dispatcher of a railroad in charge and control of the movements of the trains, and to whose orders the conductors and engineers were subject, was a representative of the company and not a fellow-servant with those engaged in operating and moving the trains. [Smith v. Railroad, 92 Mo. l. c. 369.]

And Judge TAFT said in an opinion he delivered in the case of Railroad v. Camp, 65 Fed. 959, 960 and 964: "He [the train dispatcher] is a vice-principal for two reasons: First, because he is *pro tempore* in supreme control of a distinct department of the railroad, namely, the running department of the company for his division; and, second, because the work which he is called upon to do is the discharge of a positive duty owed by the company to its employees. . . . Again, the railway company is bound to provide general laws and general time-tables for the reasonably safe operation of its railway system and also rules applicable to emergencies likely to arise. It is inevitable that at times and in sudden exigencies the general time-table must be set aside. It then becomes the duty of the company to construct a temporary time-table with such care and skill that it may be reasonably adapted to secure the operation of all trains on the road without accident or injury to passengers or employees. The person who devises this temporary time-table for the company and issues telegraphic orders to carry it out is the train dispatcher. He acts, it is true, under certain rules, but he is entrusted with a wide discretion and absolute control. . . . That he is the representative of the company and not the fellow-servant of those required to obey his orders, is held by many courts."

The Supreme Court of Pennsylvania, in the case of Lewis v. Seifert, held, "that a train dispatcher of

a railroad company was not a fellow-servant with the engineer, and that the company was liable for damages for his injury caused by the negligence of the dispatcher." [Lewis v. Seifert, 2 Am. St. 631-636-7.]

Judge McCrary held, that "the negligence of the persons who are employed by the railroad company to direct the movements of trains, by telegraph or otherwise, as, for example, the train dispatcher, train master, or whoever the persons are—is not chargeable to a person occupying, as this plaintiff did, the position of fireman, and the negligence of such persons is the negligence of the company." [Crew v. Railroad, 20 Fed. 87-92.]

The Supreme Court of Michigan, in discussing this question, said: "This cannot be applied when the superior causing the injury represents the master, and it is always a subject of inquiry to ascertain the nature and extent of the authority of the superior whose negligence caused the injury. If his authority and duties are such as the master must necessarily, either personally or by another, exercise and discharge, then this rule does not apply." In such case, "he is the corporation for the time being, and exercises powers which neither the superintendent nor the president nor any other officer or agent of the corporation can interfere with," and cites the case of Smith v. Railroad, 92 Mo. 359, among many others; and then held that the dispatcher was not a fellow-servant with the employees who were engaged in the operation of the train. [Hunn v. Railroad, 44 N. W. 502; also, Hankins v. Railroad, 37 N. E. 466.]

It was held in the case of Clyde v. Railroad, 69 Fed. 678, that "the only legal question involved is as to the finding of the special master, that the train dispatcher is the *alter ego* of the defendant. The correctness of this finding is too clear for discussion. He is not, either upon principle or authority, a fellow-

servant of the engineer," citing the following cases: Hankins v. Railroad, 142 N. Y. 416; Dana v. Railroad, 92 N. Y. 639; Slater v. Jewett, 85 N. Y. 62; Darrigan v. Railroad, 52 Conn. 285; Lewis v. Seifert, 116 Pa. St. 628; Railroad v. Barry, 58 Ark. 198; Railroad v. McLallen, 84 Ill. 109; Washburn v. Railroad, 3 Head 638; Railroad v. Arispe, 5 Tex. Civ. App. 611; McKinn. Fellow-Servants, sec. 143. To the same effect are the following cases: Railroad v. Henderson, 37 Ohio St. 552; Railroad v. Dwyer, 36 Kan. 58; Phillips v. Railroad, 64 Wis. 475; Railroad v. Kanaley (Kan.), 17 Pac. 324; McKinne v. Railroad, 21 Am. & Eng. R. R. Cas. 539; Murphy v. Smith, 19 C. B. (N. S.) 361; Moran's Case, 44 Md. 283; Dobbin v. Railroad, 81 N. C. 446; Cowles v. Railroad, 84 N. C. 309; Dowling v. Allen, 74 Mo. 13.

The same rule is stated by this court in the following language: "This duty of course, in an extensive business, the master cannot attend to in person, but must intrust to servants, but the servants to whom it is entrusted act in the master's place and perform his duty; and if they are negligent, it is his negligence. It is necessary to observe a distinction between the performance, on the one hand, of the work for which the business is undertaken, and the furnishing, on the other, of the appliances and field of operation with which and in which to do the work; in the one, the servants are working for a common master; in the other, the master, either *per se* or *per alium,* is performing his duty to his servant. And whether he acts *per se* or *per alium,* if he fails to exercise reasonable care, he is negligent." [Jones v. Railroad, 178 Mo. l. c. 544.]

Judge Goode of the St. Louis Court of Appeals states the rule clearly in a case where, in obedience to the directions of a foreman, the plaintiff, who was a motorman, started out of the car-sheds with a car,

but stopped after passing outside a car's length or so from a structure called the sand-shed to get some sand for use on the trip, as was his duty. The foreman ordered him to stop where he did, and, while there, the foreman started the car without warning and injured him. Judge GOODE said: "In Missouri the power of superintendence and control has often been taken as the true criterion, though it is rejected in various jurisdictions. The decision for the plaintiff in the case just cited [Bane v. Irwin, 172 Mo. 306] was put on the ground that the employee whose negligence hurt him had authority to direct and control him. This test of the master's responsibility is expounded on principle and authority, and the Missouri cases cited in Miller v. Railroad, 109 Mo. 350. It strikes us as a reasonable test and well suited to work out just results under the complicated industrial system of these days, when enterprises have many distinct departments and headquarters under separate managers, and the proprietors of them rarely give orders to or personally supervise the employees." [Bien v. Railroad, 108 Mo. App. l. c. 409.]

The case of Miller v. Railroad, supra, was where the conductor of a construction train, who had charge and control of the crew of men engaged in repairing the railroad track, ordered the injured party to perform certain services upon one of the cars, and while he was in the act of stepping from a car the train was, without warning, moved, and threw him down between the wheels and injured him. Judge BLACK, in discussing that case, said: "Where the master gives to a person power to superintend, control and direct the men engaged in the performance of work, such person is as to the men under him a vice-principal, and it can make no difference whether he is called a superintendent, conductor, boss or foreman. For his negligent acts and omissions in performing the duties of the

master, the master is liable. This principle of law has been often asserted by this court and applied under a variety of circumstances.'' [Klochinski v. Lumber Co., 93 Wis. 417; Bane v. Irwin, 172 Mo. 317; Donahoe v. Kansas City, 136 Mo. l. c. 670.]

The gigantic institutions of our times engaged in construction, production and distribution necessarily involve in their operation the use of powerful machinery and multitudes of employees, so that it becomes wholly impracticable for their proprietors or principals to personally superintend, operate and control them, and as a result they are compelled to resort to agents to carry on their business, and these agents are variously called superintendents, general managers, foremen, bosses, etc. Many of those institutions are so large and complicated that one superintendent cannot control and operate them, and in such case they either have a superintendent and assistants, or divide their business into departments, with a superintendent or foreman in charge of each department. All of these agents, by whatever name or title they may be known or called, represent the principal. From this condition of those institutions, has grown up the wise and almost universal rule of restriction of the fellow-servant law, known as the vice-principal, and the departmental doctrine, which hold the master liable to one servant for the negligent performance by another of these personal duties which every master owes to his employees. There is really no legal distinction between the two rules — in the former the vice-principal is supposed to have charge of the entire business of his principal, while in the latter he has only charge of his department.

The law imposes upon the master certain duties regarding the safety of his servants, which he may delegate to another, but by doing so he is in no wise discharged from the responsibility of their proper per-

formance. If a servant be injured through the negligent performance of any such duty by another to whom such duties have been delegated, the principal cannot escape liability therefor on the ground of negligence of the fellow-servant.

The rule may be restated as follows: A servant intrusted with the performance of the master's personal duties is, in respect of those duties, a vice-principal or representative of the master, and his acts as such, whether of omission or commission, are the acts of the principal; and, if negligently performed, the principal is liable for all injuries that may naturally flow therefrom, and he must answer in damages to the injured servant the same as if he had committed the act in person.

"A distinction is to be drawn between mere telegraph operators and train dispatchers, as well as the other employees of a railroad. A telegraph operator ordinarily is not invested with any control over the running of trains, and it has been held that a telegraph operator does not occupy the position of a train dispatcher merely because he transmits or delivers orders for the movement of trains, and that his negligence cannot be said to be the negligence of the company." [12 Am. and Eng. Ency. Law (2 Ed.), 968.]

Rule No. 10 and the oral testimony in the case leave no room for doubting that Harbaugh and Havens, the car dispatchers, had absolute charge, control and supervision of the conductors and motormen, and the cars and their movements and operation; and, according to the principle of law before stated, they were not fellow-servants with Moad and Edge, the conductor and motorman respectively, but were vice-principals, and were representing the railroad company when telephoning and receiving orders regarding the operation of the cars.

It seems to us that the greater weight of evidence tended to show that the car dispatcher gave an erroneous order to the conductor of car No. 30, which caused it to collide with car No. 29, just west of Morgan; and there was evidence in the case from which the jury might have properly drawn the conclusion that Edge was, under the circumstances as they existed at the time he jumped from the car, not guilty of negligence in so doing, which question was properly submitted to the jury by plaintiff's fourth instruction.

The plaintiff's evidence made out a prima-facie case and entitled him to go to the jury, and the demurrer to the evidence offered by defendant at the close of the evidence was properly refused.

II. Defendant next makes the point that the court erred in admitting any evidence under the petition, because the Fellow-Servant Law of 1897 does not apply to street railroads, and assumes that Havens, the car dispatcher, and plaintiff were fellow-servants under the common law.

This point is effectually disposed of by what has been said in paragraph one of this opinion. Clearly they were not fellow-servants, as shown by the numerous authorities there cited and discussed.

While it may not be necessary to notice the suggestion of defendant regarding the Fellow-Servant Law of 1897, because of what has been said before, yet it may not be out of place to say that there is no allegation in the petition or answer that the defendant was a street railroad company, nor is there any evidence in this record which tends in the remotest degree to show that fact. The petition alleges that it is a corporation, engaged in the operation of an electric railway between the city of Carthage, Missouri, and the city of Galena, in the State of Kansas, and, in the absence of a denial under oath, that fact, under our

statute, is to be taken as admitted. But independent of that, all the evidence in the case for both plaintiff and defendant shows conclusively that the allegation is true, and that the length of the road is thirty or thirty-five miles and passes through some twelve or fifteen towns or stations, with but little of the track inside of the city limits, merely passing through as any railroad does.

We have not been cited to any law which would authorize defendant to construct and operate a street railroad through a rural district, connecting one town or city with another and extending from a point in one State to that in another, nor do we know of the existence of any such law; nor can we presume that such a line of road was constructed and is being operated without any legal authority.

Plaintiff's counsel states in his brief, under the head of Points and Authorities: "Notwithstanding it was our opinion that on principle the Fellow-Servant Act of 1897 applied to street and interurban electric railways, this case, because of a prior recent decision of our Supreme Court, was tried on the theory that the Act of 1897 did not apply." It would seem from this statement, that counsel for plaintiff concludes that the Fellow-Servant Law of 1897 does not apply to the defendant company as declared by this court in the case of Sams v. Railroad, 174 Mo. 53. The answer in the Sams case was a general denial, contributory negligence, "and a special plea that defendant was a street railroad corporation organized for the purpose and engaged in the business only of conducting a street railroad," etc., and the evidence showed that it was engaged in the street railroad business only, and for that reason it was held the Fellow-Servant Law did not apply. There is no such allegation or proof in the case at bar; and for that reason the rule announced in the Sams case has no application here. That case goes to

the extreme limit, and should not be enlarged in its operation in the smallest degree. We are, therefore, of the opinion the Fellow-Servant Act of 1897 does apply to the defendant company.

III. Buren Moad, the conductor of the car No. 30, testified that when his car arrived at Morgan he called up the car dispatcher, Havens, by telephone, and reported that his car was at Morgan, and that he was instructed by the car dispatcher to meet car No. 29 at Syracuse, and that he repeated the order back to the car dispatcher, just as he received it.

Over the unsuccessful objection of defendant, the plaintiff and three other witnesses were permitted to testify in corroboration of what Moad repeated back or stated over the 'phone to Havens. Defendant contends that such evidence was hearsay and that it should have been excluded from the jury, and claims the court erred in admitting it. We are unable to see any merit in the objection. Both plaintiff and defendant testified and admitted that Moad did call up Havens and asked for orders, and that Havens gave them to him, and that he repeated them back to Havens. Now, the plaintiff contends that the order and reply was one thing, and the defendant contends it was another. We know of no other way by which that conversation which took place between them over the 'phone could be proven except by the witnesses who were present at each end of the line when the conversation took place, and heard what each party said. They testified not only to the report of Moad, that he was at Morgan, but they also testify that, after reporting that fact, they then heard him report or state over the 'phone, "30 meet 29 at Syracuse," etc., and if that was what he said, then Havens was mistaken when he testified that Moad repeated back to him that 30 would meet 29 at Morgan, or words to that effect. The words that were spoken at both ends of the line constituted the order, and it was

competent to prove what those words were by the wit-. nesses who were present at each end and heard them spoken. There was no error in the admission of that evidence.

Defendant contends that Havens, the car dispatcher, gave Moad, the conductor of car No. 30, an order to meet 29 at Morgan, and that he disobeyed that order and attempted to go to Motley, and that while *en route* to that place the collision occurred, and that plaintiff's injuries were the result of Moad's negligence and not that of the company, and for that reason he should not be permitted to recover in this case. In reply to that contention it is sufficient to state that that was a question of fact for the jury to pass upon, and it was properly submitted to the jury by an instruction asked by defendant, and the jury found for the plaintiff, so that question is settled so far as this court is concerned.

IV. The defendant contends that the court committed reversible error in permitting plaintiff to amend his petition after the introduction of all his evidence, and not continuing the case on its application, which was based upon surprise.

The amendment consisted simply in changing the allegation of the original petition, which stated that he was injured by the collision of the cars, to the allegation that he jumped therefrom when he saw his position was perilous. There was no amendment as to any of the allegations of negligence of the defendant, which he claimed caused his injuries. This did not change the issues. The same witnesses who saw the accident saw plaintiff jump, and they testified as to the conditions surrounding him at the time he jumped, and no one else could have thrown any light upon that question except those who saw the collision and the jump. So, it necessarily follows that defendant had the benefit of all the witnesses who saw the collision and they were the same ones who saw him jump.

As stated by counsel for plaintiff, "Manifestly the amendment merely cured an immaterial variance. The gist of the cause of action alleged under both petitions was the negligence of the company giving conflicting orders; and whether the respondent was injured in the collision or by escaping from it is a matter of trivial importance." [Chouquette v. Railroad, 152 Mo. 1. c. 257-263; Fischer & Co. v. Realty Co., 159 Mo. 1. c. 562, 563; Raming v. Railroad, 157 Mo. 477; Hensler v. Stix, 113 Mo. App. 162-174-5; Keeton v. Railroad, 116 Mo. App. 281.]

V. There was no error in the action of the court in admitting the photographs in evidence. They tended to show the physical conditions which existed at the time of the accident; they also threw light upon the rate of speed the cars were moving at the time of the collision. Photographs are admissible in evidence upon the same principle that maps and plats are admitted.

VI. There are several other assignments of error which we have examined and found to be without merit and of so little importance in their bearing upon the issues of the case that we will not discuss them in this opinion.

It must follow from what has been stated that the judgment of the circuit court must be affirmed, and it is so ordered.

All concur.