The Appellate Division having denied the plaintiff's application for leave to appeal, permission was granted by a judge of this court. The plaintiff seeks to recover damages for personal injuries received in the yard of the defendant company at East Rochester, on a branch track, which was used for hoeing the ashes out of engines before taking them into the roundhouse for certain purposes. The time of the accident was between sundown and dark on the 10th of July, 1900. The plaintiff entered the employ of the defendant on the 23rd of January, 1900.
It was the custom of the defendant when its engines arrived in the yard at East Rochester to run them upon a certain track for the purpose of removing therefrom the ashes in the firebox and ashpan; for this purpose two men were employed, a hostler and a hoer; the duty of the hostler was to run the engine as temporary engineer, to shake down the ashes into the ashpan and to remain in the cab until work was completed; the hoer crawled under the engine with two hoes, one long, the other short, and a lantern.
On the evening of the accident there were three engines on the waiting track, and the hostler said to the plaintiff that he must "hurry up, that there was a helper to go out." The plaintiff testified as follows under cross-examination: "I got right under the engine and hoed it out. I went in between the pilot wheel and the first driver, then I went back to the front end of the ashpan and that was just back of the axle of the middle driver. The back of the ashpan shows right here. The front of the ashpan comes about here; here is where I get, I get back here. I get back between the two *Page 279 
first drivers, there. I had the hoes and lantern and I hoed out the ashes as the hostler shook them down to me. Lyon (the hostler) called to me after he got through shaking. I heard him holler when he was done shaking. I could hear him plainly. He was right in the cab. I couldn't say how far Lyon was from me. I don't know the length of the engine. I think it was further than 10 or 15 feet from me to him. He was about here and I would be here, probably 25 feet. The distance would be from the cab to the space between the first and second drivers. After he called to me that he was through shaking, I finished the work of cleaning out the ashes from the pan, then I put out my tools first, as I always did, and started to climb out just the way I got in; between the front driver and the pilot, the front wheel, and when I was part way out the engine moved backwards and this front wheel caught my leg at the ankle and cut it off."
It was the practice of the hostlers and hoers to proceed as follows: The hostler, when all the ashes had been shaken down, would indicate that fact by calling out or ringing the bell of the engine; the hoer after finishing his work would crawl from beneath the engine at the point where he entered, and having reached a place of safety he would either exhibit himself to the hostler or call out "all right."
There is no evidence in this case that the defendant company established any rule, written or unwritten, in regard to the manner in which this very dangerous work should be prosecuted. It is admitted that the hostler had received no word from the plaintiff that he had reached a place of safety, but recklessly backed the engine, cutting off the leg of plaintiff.
The counsel for plaintiff rests his claim that the defendant was negligent upon two grounds: (1) "In its failure to make and promulgate a rule for the safety and protection of the plaintiff in his employment as a hoer of ashes and cinders under the locomotives in the defendant's yard;" and (2) "in its failure to have and maintain ashpits between the rails of the tracks upon which the engines were cleaned out, when the defendant had in use and was maintaining long before and at *Page 280 
the time of the accident such ashpits in its yards in other places along the line of its railroad."
In regard to the second ground above stated, the following facts appear: It was the practice of the defendant, after the work of cleaning the engines was completed, to send men upon the track to shovel the ashes and deposit them on either side of the same. The pile of ashes so deposited was allowed to reach the height of three feet or more before they were removed. The plaintiff testified as follows: "At the time this accident occurred the ashes were about four feet high on the north side of the track and about three feet on the south side; they were piled right up from the rail. They were piled slanting right up from the rail over on each side; a little higher on the north side than it was on the south side. You could not get out at all on the north side, but you could get out on the south side by crawling up hill on this pile of ashes."
While we are not inclined to rest our opinion of the defendant's negligence on the second ground as stated, it is evident that these ashes and cinders were allowed to accumulate to an extent that greatly increased the peril to which the plaintiff and other employees were subjected when getting from beneath the engine as described. It may very well be that the existence of ashpits would be the safer mode of conducting the work, yet the evidence is not sufficiently definite to present the question in a satisfactory manner.
This court has had occasion to deal with cases involving the safety of repairers when working under cars upon the repair or cripple track; also as to the safety of inspectors of cars when engaged in the discharge of their duties in depots, where trains were making temporary stops. It is very apparent from the evidence in this case that the duty of an ashhoer beneath an engine is even more perilous than the employment of inspectors and repairers.
In Abel v. D. H.C. Co. (103 N.Y. 581) the plaintiff's testator was a car repairer in the employ of the defendant, and while under one of its cars standing upon a side track engaged in making repairs, its employees, using an engine, carelessly *Page 281 
backed a car against it, and thus he came to his death. This court said: "The principal claim on the part of the plaintiff is that the evidence tended to show that the defendant had not made and promulgated proper rules for the government of its employees, and hence that its negligence in that respect should have been submitted to the jury. The law imposes upon a railroad company the duty to its employees of diligence and care, not only to furnish proper and reasonably safe appliances and machinery and skilled and careful co-employees, but also to make and promulgate rules which, if faithfully observed, will give reasonable protection to the employees. (Slater v. Jewett, 85 N.Y. 61;Besel v. N.Y.C. H.R.R.R. Co., 70 N.Y. 171; Sheehan v.Same, 91 N.Y. 339; Dana v. Same, 92 N.Y. 639.) * * * It matters not that there was a custom or rule among the repairmen in the employ of the defendant at Mechanicville that they should place a red flag at each end of the cars which they were repairing. It does not appear that the rule was regularly promulgated by the defendant, or that obedience to it was required by the defendant; nor does it appear that it was printed or generally known to the engineers engaged in running trains. * * * We do not perceive how it was possible to say, as matter of law, that the rules of the defendant were proper and sufficient for the protection of its repairmen, and that it should not have taken greater precautions, by rules or otherwise, for their safety. We think the facts should have been submitted to the jury and that the nonsuit was improper."
This case is particularly applicable to the one at bar, in that the company had promulgated no rule for the safety of employees engaged in the occupation of this plaintiff, but that whatever rule or mode of procedure existed among the employees appears to have been a custom or practice adopted by them for their own safety, which necessarily lacks the importance and force of a rule enacted by the defendant, printed among its general rules, and to which implicit obedience would be required.
In Devoe v. N.Y.C. H.R.R.R. Co. (174 N.Y. 1) *Page 282 
the case of plaintiff's intestate, who was a car inspector, is presented. The facts in the case cited were more favorable to the defendant than in the case at bar. The evidence was undisputed that at the time of the death of intestate, and for some time prior thereto, defendant's foreman of the car department, without instructions from the company, had made and promulgated a verbal rule and instituted a practice at its station in Syracuse, where this accident occurred, which, if observed, might have prevented the casualty. The substance of this rule was that an inspector was forbidden to go under a car without protecting himself by putting a man on guard. The trial judge left it to the jury to say, as matter of fact, whether this was a reasonable rule under the circumstances. The jury rendered a verdict for the plaintiff. It would seem quite clear that in the hurry of inspecting the cars of a train that was making a three or five minutes' stop at a station it was quite impracticable for the inspector to hunt up some man who would stand guard over the car under which he was making an inspection, or how efficacious the presence of such a person would prove when standing a long distance from either end of the train where engines or additional cars might be attached. The Appellate Division reversed the judgment entered upon the verdict upon questions of law only, and an appeal was taken to this court.
Judge VANN, writing, said: "When the business of a master is such that the safety of one servant depends upon the way in which other servants do their work, it is his duty to make, promulgate and enforce reasonable and sufficient rules for the protection of the servant exposed to danger. * * * While the defendant was without any printed rule upon the subject, except the one quoted, which was a dead letter because it was not enforced, its foreman of the car department testified that he, without instructions from the company, or from any superior officer, had established a practice by verbal directions to certain employees which in his opinion afforded ample protection. * * * The duty of a master in making rules is measured by the law of ordinary *Page 283 
diligence. That law varies with the situation, for what would be ordinary diligence under one set of facts would be negligence in another. If, however, under the circumstances of a particular case, the master has met the obligation of ordinary diligence in making and enforcing a rule, he is free from liability, even if some other rule would have been safer and better. The law requires him to make and promulgate reasonably safe and proper rules, and if he does so he is not liable, even if he might have made safer and more effective rules. If a rule is actually made the question still remains whether it is proper and sufficient under the circumstances, for due diligence is not satisfied by an insufficient and inadequate rule. There is an essential distinction between rules made by a master for his own protection and the regulation of his business in his own interest, and those made for the protection of his servants, for in the one case the sufficiency affects no one but himself, while in the other the lives and limbs of his servants are involved. Hence, it has been held that the reasonableness of rules to regulate the purchase and surrender of tickets, the checking of baggage, ingress and egress from trains and the like, is a question of law. (Vedder
v. Fellows, 20 N.Y. 126; Avery v. N.Y.C. H.R.R.R. Co.,121 N.Y. 31, 44.) * * * When, however, as in this case, the situation was complicated owing to the large number of tracks and trains, and the rule was not only verbal, leaving its enforcement to the unaided recollection of a simple announcement, but the delay in finding the depot master, the difficulty of getting men to act as watchmen, the danger of taking them from other employment and the temptation to run a momentary risk rather than to consume time in order to be safe, were so great that the question of the sufficiency of the verbal instructions was for the jury. (Abel v. D. H. Canal Co., 103 N.Y. 581; S.C.,128 N.Y. 662, 667; Ford v. L.S. M.S. Ry. Co., 124 N.Y. 493;Berrigan v. N.Y., L.E. W.R.R. Co., 131 N.Y. 582, 585;Doing v. N.Y., O. W. Ry. Co, 151 N.Y. 579; Dowd v. N.Y.,O. W. Ry. Co., 170 N.Y. 459.)" *Page 284 
The cases cited illustrate the general legal principles applicable to railroad companies in enacting rules for the protection of their employees. In the case before us we have a state of facts differing in many particulars from those presented in any of the cases cited. It is obvious that the physical conditions surrounding the plaintiff when engaged in his work exposed him to great peril.
As before pointed out, the mode of procedure adopted by the men was that when all the ashes were shaken down the hostler would announce the fact verbally or by ringing the bell of the engine; thereupon the hoer, after finishing his work, would remove his tools and himself to a place of safety and announce the fact to the hostler by calling out "all right," or exhibiting himself in person.
In view of the great peril surrounding this work, a rule promulgated by the company might well be printed among its general rules, requiring the hoer to reach a place of safety in sight of the hostler. The confusion and noise existing in a railroad yard where engines and cars are in almost constant motion and steam escaping to a greater or less extent, renders it hazardous to trust to the calling out of the hoer that he has reached a place of safety; the hostler might be misled by the noise and confusion and mistakenly assume that he had heard the voice of his associate.
We are of opinion that it was a question of fact for the jury as to the duty of the defendant to have promulgated a written rule in view of the dangerous surroundings of the work of hoers of ashes and cinders underneath engines, and whether its failure to do so was negligence, rendering it liable to the plaintiff in damages for the injuries he sustained.
The order and judgment of the Appellate Division should be reversed, with costs to the plaintiff in all the courts to abide the event, and a new trial ordered.
VANN, WERNER and WILLARD BARTLETT, JJ., concur; CULLEN, Ch. J., O'BRIEN and HAIGHT, JJ., dissent.
Ordered accordingly. *Page 285