## STEWART v. HINKLE IRON CO.

(Supreme Court, Appellate Division, First Department.    December 2, 1910.)

1. MASTER AND SERVANT (§ 107*)—INJURY TO SERVANT—SAFE PLACE TO WORK.

The rule that a master must furnish a safe place for his employés to work does not apply to the construction of a building where the place is rendered unsafe by the work and by the manner in which it is done.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 199–202; Dec. Dig. § 107.*]

2. MASTER AND SERVANT (§ 279*)—INJURY TO SERVANT—FELLOW SERVANTS—INCOMPETENCY—EVIDENCE.

Where the evidence indicated that the injury to a structural iron worker at work in the erection of a building was caused by the failure of the engineer in charge of the hoisting engine to properly operate it, and there was no evidence of prior acts of incompetency of the engineer, or that the master knew or should have known thereof, there was no evidence of negligence of the master in employing an incompetent fellow servant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 975; Dec. Dig. § 279.*]

3. MASTER AND SERVANT (§ 278*)—INJURY TO SERVANT—NEGLIGENCE—EVIDENCE.

In an action for injuries to an iron structural worker, while at work on a building, by being struck by a girder being lowered to the ground, evidence *held* not to show negligence of the master in adopting the rule of signaling the engineer in charge of the stationary engine by giving signals by the hand instead of by bell or whistle.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 969; Dec. Dig. § 278.*]

4. MASTER AND SERVANT (§ 278*)—INJURY TO SERVANT—NEGLIGENCE—EVIDENCE.

Where a master engaged in constructing a building did not require the structural iron workers to go up or down the derrick used to lower or hoist material, but the workers could use ladders, and it was not necessary to lower material in such manner as to bring it over the derrick, down which a worker was descending when he was struck by a girder being lowered to the ground, there was nothing to show negligence of the master in failing to adopt a rule forbidding the lowering or hoisting of material while men were going up or down the derrick.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 969; Dec. Dig. § 278.*]

5. MASTER AND SERVANT (§ 141*)—OBLIGATION OF MASTER—RULES OF EMPLOYMENT.

A master need not make rules that will protect his employés against the negligence of fellow servants in every situation that may arise, nor is he bound to foresee mistakes by fellow servants, and promulgate a rule to prevent accidents resulting from such mistakes.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 283; Dec. Dig. § 141.*]

6. MASTER AND SERVANT (§ 196*)—FELLOW SERVANTS—WHO ARE.

The foreman, pusher, engineer, and iron structural worker engaged in erecting a building, in the performance of their respective duties, other than those of inspection and repair of machinery and appliances, are fellow servants, and each assumes the risk of any negligence on the part of the others.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 486–488; Dec. Dig. § 196.*]

Appeal from Trial Term, New York County.

Action by James Stewart against the Hinkle Iron Company. From an order vacating an order dismissing the complaint at the close of plaintiff's case, and granting a new trial, defendant appeals. Reversed, and motion for new trial denied.

Argued before INGRAHAM, P. J., and McLAUGHLIN, MILLER, LAUGHLIN, and DOWLING, JJ.

John Vernon Bouvier, Jr., (Dudley Davis, on the brief), for appellant.

John M. Ward, for respondent.

LAUGHLIN, J. After nonsuiting the plaintiff the learned trial justice entertained a motion for a new trial on his minutes, and on granting the motion filed a memorandum stating that he was of opinion that there was a question of fact which should have been submitted to the jury, but he does not state what the question is.

This is an action by an employé against his employer to recover damages for personal injuries caused by the negligence of the defendant, and it is based on the common law. The defendant was engaged in constructing a new theater at the intersection of Cayler street and Manhattan avenue in the borough of Brooklyn. The plaintiff was a structural iron worker. He first entered the employ of the defendant on the 25th day of March, 1908, and he worked at this theater a few hours on that day. He resumed work there the next morning, and, after working a few hours while in the act of descending from the gallery to the main floor he was struck by an iron girder which was being lowered to the ground. The men engaged on this work were all in the employ of the defendant. They consisted of a foreman, who was absent at the time of the accident, one Hansen, whose position is designated as "pusher" and who had charge in the absence of the foreman, and an engineer who had charge of the operation of a stationary engine, used in hoisting and moving material, and three iron workers including the plaintiff. The negligence charged in the complaint is (1) neglect to furnish a safe place, (2) neglect to furnish safe tools and appliances, (3) neglect to furnish competent and sufficient employés, and (4) neglect to make proper rules for the conduct of the work.

There was no question of fact for submission to the jury with respect to whether or not the employer had performed its duty of furnishing a safe place for its employés to work in performing their duties. The place was rendered unsafe by the work and by the manner in which it was done, and therefore the rule with respect to a safe place has no application. Citrone v. O'Rourke, 188 N. Y. 339, 80 N. E. 1092, 19 L. R. A. (N. S.) 340; Russell v. Lehigh Valley R. R. Co., 188 N. Y. 344, 81 N. E. 122, 19 L. R. A. (N. S.) 344.

There is no evidence that the tools and appliances furnished by the defendant were unsafe, or that any defect in any of the tools or appliances contributed to the accident.

There is no evidence that any of the employés were incompetent in the sense in which that term is used with reference to the duty

devolving on the master to employ competent fellow servants. There is evidence indicating that the accident was caused by the failure of the engineer to properly operate the engine or to apply the brake to the drum while lowering the girder, and he was discharged for this neglect of duty; but there is no evidence of prior acts of incompetency on his part which were known or should have been known by the defendant. There is evidence that he left the brake slip on the drum on other occasions, but it does not appear who, if anybody, became aware of it. The learned counsel for the respondent in his points charges the defendant with negligence with respect to the method employed on the job of signaling the engineer, and, although it is not clear that this falls within any of the charges of negligence set forth in the complaint, it appears to have been litigated on the trial, and we will assume that it is within the charge of a failure to furnish sufficient fellow servants or to adopt proper rules. The system of signaling the engineer in use on the work was known as signaling by hand. It is claimed that in the circumstances this was inadequate and unsafe, and that the engineer should have signaled by what is known as the "bell system." The iron work on the first story and on the balcony had been completed, and part of the iron work on the gallery had been performed. There was a large boom derrick with a mast and swinging boom and tackle of the usual pattern. The base of the mast of the derrick rested on the main floor and a little to the right of the center of the theater and about midway between the front of the balcony and the stage. A dummy double cylinder steam hoisting engine of the ordinary type used in operating the derrick was placed under the balcony about 30 feet from the mast of the derrick. The engine had a drum or cylinder to which a cable was attached to control the boom of the derrick by raising or lowering it as circumstances might require, and another drum or cylinder with a cable which was attached to the load suspended at the end of the boom of the derrick and used to raise or lower the load. The power from the engine was applied or cut off by a throttle; and when the power was thrown on the engineer could apply it to either or both cylinders or drums by means of a separate friction lever for each. There was also a foot brake for each drum, and by pressing down on the brake with the foot a band of iron would clasp the drum and check its speed or stop it entirely at the will of the engineer. There were also on the cylinder or drum controlling the load a ratchet wheel and dog by which the load could be stopped at any point and held without regard to the power or foot brake. When it became necessary to elevate or move the load, Hansen stood near the mast of the derrick where he could see the load and see where it was desired to place it, and where he could also see the engineer, and he would signal the engineer by movements of his hands and fingers in accordance with a code of signals in common use on similar work which was well understood by Hansen and by the engineer. Shortly before the accident an iron girder, weighing 1½ tons, had been hoisted from the main floor to the gallery. The plaintiff and the other iron workers were in the gallery ready to receive the girder and to

put it in place. It was the plaintiff's particular duty to fit the girder when it was swung into place and to insert bolts to hold it there. After the girder was hoisted up it was necessary to let the boom of the derrick down in order to swing it out to the place where it was to be attached. On this being done, it was discovered that the wrong girder had been hoisted up, and Hansen ordered the plaintiff to come down to help receive the girder on the ground when it was lowered. The defendant had another derrick in the theater known as breast or house derrick which was not in use as a derrick at the time. At the top it rested against the gallery or a girder extending to the gallery and it was used by the men as a ladder in going up and down. There were ladders about the interior of the theater which were at times used when the men were not in a hurry and which might have been used for this purpose, but the derrick was conveniently located, and it was customarily but not exclusively used by the men to the knowledge of the foreman although without any specific instructions to do so. According to the testimony of the plaintiff, when he started to come down the breast or house derrick the boom had been elevated up toward the mast of the derrick and the girder was suspended about 15 feet higher than the level of that part of the gallery where he was, but was not directly over him. At this time Hansen was standing in his customary position near the base of the derrick, and the engineer was standing in his usual position at the end of the drum which operated the load and where he could conveniently operate the foot brake on that drum, with his right shoulder toward Hansen. On learning that the wrong girder had been hoisted, Hansen first signaled the engineer to raise the boom and this swung the load back to about the line on which it had been elevated, and then to lower the load slowly. The engineer knew from the brief period of time that had elapsed that the girder had not been put in place and that it was to be lowered and he understood the signals perfectly and proceeded to execute them. After elevating the boom until signaled to stop and to lower the load, he proceeded to lower the load and applied the brake to the drum with his foot. He either failed to apply sufficient power to the brake or negligently disregarded the order to lower slowly, and lowered the load too rapidly with the result that the girder struck the plaintiff and knocked him off the derrick and he fell to the floor and sustained severe injuries.

It is claimed that it was improper to use the hand signaling system when the engineer could not see the load. The evidence is uncontroverted that the engineer could not see the load on account of the balcony and a cover over the engine. The engineer at first testified that if the bell system of signaling had been in use he could have kept his eyes on the drum to which he was applying the brake and thus could, on discovering that the brake was slipping, have applied more power quickly before the load got a start beyond control. On this theory it was quite immaterial whether or not the load was in sight of the engineer, for he could not have seen it while looking at the drum of the engine. It is manifest also that there is no force in the contention that one or the other system should be used

according to whether or not the load is in sight of the engineer, for under neither system is the engineer permitted to operate the engine on his own view, but he is required to follow the signals whether they are given by hand or by a bell or by a whistle. Moreover, the only reason disclosed by the evidence for using the bell or whistle system of signaling instead of hand signaling is the necessity therefor where the work has progressed to such a stage that the person directing it by standing where he is able to communicate signals to the engineer is unable to see with accuracy the load and the place for which it is destined so as to have it swung into position. The evidence shows that a system of signaling the engineer by bell or by whistle is in common use where the person who is directing the work cannot by remaining in sight of the engineer see the work sufficiently to direct it properly. There was therefore, we think, no question of fact presented by the evidence for the consideration of the jury with respect to whether or not the defendant was negligent in using the hand system of signaling. The engineer is doubtless correct in his theory that it is somewhat difficult to apply the right amount of power to the foot brake on the drum to lower the load slowly without looking at the drum to see how the brake is working, but there is nothing in the evidence to show that he could not have done this. He testifies, it is true, that he was watching Hansen, which required him to face toward his right, and that it was necessary for him to keep his eyes on Hansen in order to observe a modification or change if the signal should be given. That evidence is insufficient to require that the case be submitted to the jury. When the engineer received a signal to lower the load it was plainly his duty then to give proper attention to his engine to start to lower the load slowly in accordance with the signal. The engine was properly equipped with appropriate appliances for holding, starting, or stopping the load and for regulating its speed up and down, and it only remained for the engineer to make proper use of them. Doubtless, after commencing to execute the order and on seeing that the proper amount of power was applied to the brake to lower the load slowly, it was his duty to give attention to Hansen to see whether any other signal might be given. He knew what the load was and he should have given sufficient attention to his engine by using his eyes if necessary as well as his feet to see that the load was being lowered slowly in accordance with the signal and he finally in effect admitted that he did not do so at the start. He stated, among other things, that after receiving the signal to lower the load, "I let the iron lower pretty fast, faster than I ought to have done"; that "as soon as I put my foot onto the brake the drum took hold"; that he knew that he was lowering the same load that he had elevated and that it weighed about a ton and a half; and that "I will admit that I let the iron come down pretty fast, much faster than usual." On his cross-examination the engineer admitted that these statements were true. No part of the engine or cable was broken even by the accident, and all parts of the machinery were in perfect working order after the accident. This evidence on the part of the engineer, who was friend-

ly to the plaintiff, for he was discharged by the defendant immediately after the accident, must be regarded as a modification of the testimony that he first gave, and it indicates, as does the other evidence, that the machinery gave him perfect control of the load, but that he allowed the load to come down too fast.

On the argument it was contended, although the points contain no such claim, that the defendant should have adopted a rule forbidding the lowering or hoisting of material while men were going up or down the derrick. We are of opinion that it is without merit. The defendant did not require the iron workers to go up or down the derrick, or to be under the load while it was being hoisted or lowered. There were, as already stated, ladders which might have been used by the men in going up and down. There is nothing to show that it was necessary to lower the load in such manner as to bring it over the derrick down which plaintiff was descending. For aught that appears this is the only occasion on which material was suspended or lowered over employés, and very likely it was an unusual if not an emergent situation caused the mistake in hoisting the wrong girder. It may well be that on all other occasions the men climbed the derrick used as a ladder before the material was hoisted and ordinarily they would only descend after they had securely attached the load in its place in the new structure. A master is not obliged to make rules that will protect his employés against the negligence of the fellow workmen in every situation that may arise. The foreman, pusher, engineer, and iron workers in the performance of their respective duties during the progress of the work, other than the inspection and repair of machinery and appliances, were all co-employés and each assumed the risk of any negligence on the part of the others. The defendant was not obliged to foresee that they might by mistake elevate the wrong girder which would render it necessary for the iron workers to go below and to make and promulgate a rule to the effect that the load should not be lowered while the men were coming down. Where, how and when the material should be hoisted or lowered and where, how and when the men should go up and down were mere details of the work, concerning which, in the circumstances here disclosed, we are of opinion that negligence cannot be imputed to the master for not having made a rule such as the one suggested on the argument. In Dowdell v. Lackawanna Steel Co., 198 N. Y. 362, 91 N. E. 789, it was held that the use in the operation of a locomotive crane of safety devices to prevent its tipping over owing to the weight of the load it was handling or to the unevenness of the track, was a detail of the work and that negligence could not be imputed to the master for not having made and promulgated a rule with respect to when the safety devices should be used. I am of opinion that, on principle, that is a controlling authority here.

This is not a case where there was fixed, regular work at a particular place required to be performed in a given way and to be continued for some time which might have been regulated or rendered more safe by a rule, or a case where a rule was necessary to insure knowledge of a situation on the part of other employés from whom

danger was to be apprehended as in McCoy v. N. Y. C. & H. R. R. Co., 185 N. Y. 276, 77 N. E. 1174, and Van Alstine v. Standard Light, Heat & Power Co., 128 App. Div. 58, 112 N. Y. Supp. 416, and kindred authorities.

We are of opinion, therefore, that there was no question for the jury, and that the order should be reversed with costs, and the motion for a new trial denied, with $10 costs.　All concur.