THOMAS W. WEBB and BARBARA E. WEBB v. SPENCER SALISBURY, MARY SALISBURY and ROSE M. CLINTON, Appellants.—39 S. W. (2d) 1045.

Division Two, June 5, 1931.

1124

*Clay C. Rogers* and *Burrus & Burrus* for appellant.

*Manard & Schwimmer* and *Walter H. Maloney* for respondents.

COOLEY, C.—This action was brought in the Circuit Court of Jackson County to cancel certain notes and a deed of trust securing same, and to set aside a sale and trustee's deed pursuant thereto made in foreclosure of the deed of trust, and for other equitable relief. From a judgment in favor of plaintiffs decreeing part of the relief prayed, defendants appealed.

Plaintiffs' second amended petition, upon which the case was tried, is long and none too clear, covering seventeen printed pages. We shall attempt to summarize its prolix averments. In substance it sets forth: That plaintiffs, husband and wife, owned certain lands, 120 acres, in Jackson County, Missouri, upon which they borrowed

$6500 from the Kansas City Joint Stock Land Bank, securing the loan by first mortgage or deed of trust on the land; that on July 3, 1923, there was filed and recorded in the Recorder's office of Jackson County "an alleged second deed of trust" (the one in controversy), dated July 2, 1923, purporting to be a conveyance by plaintiffs of said lands to Rufus Burrus, trustee, to secure two notes of even date, one for $500 due six months after date and one for $2500 due one year after date, payable to Joe Birnbaumer; that on said July 3rd, there was also filed and recorded a deed of trust given by plaintiffs to secure their note of $800 to one Prewitt, which deed of trust recited that it was subject only to the Land Bank's deed of trust, and was so intended and understood by all parties interested in it and in the $3000 deed of trust; that said $2500 and $500 notes were not in fact made to Joe Birnbaumer, for there was no such person, but were made to George W. Clinton, from whom plaintiffs borrowed $2000 and who used the name Birnbaumer "as and for a straw person in said deal and for himself or for convenience," but that Clinton represented that he was and in fact he was loaning his own money; that plaintiffs executed to Clinton their note for that amount, due in one year, and "for the making of said loan of $2000 agreed to pay Clinton a commission of $500, which was evidenced by their note for said sum *then executed* to him and payable six months after date" (italics ours); that of the sum so borrowed they received only $1625, Clinton retaining the balance thereof; that plaintiffs had since repaid $300 of the sum borrowed and have at all times been ready, able and willing and have offered to pay "the actual amount due upon said loan," which offers had been refused, and that they were still willing to pay the actual amount due; that George W. Clinton had died since the loan transaction and that defendant Rose M. Clinton, his widow, was appointed administratrix and as such inventoried and took possession of said two notes as assets of his estate, they having belonged to Clinton at his death, and that said administratrix had demanded payment of the notes in full (less admitted credits) which payments plaintiffs refused to make. (Note: The evidence showed two credits on the $500 note, one of $300 and one of $78.75. Plaintiff Webb testified that the payments should have been credited on the larger note.)

The petition then charges that the notes referred to in the deed of trust "are not the notes executed by the plaintiffs as evidencing the actual amount borrowed from said Clinton by them; that the notes "are fraudulent" and do not bear plaintiffs' signatures "or if they do the amounts thereof and the names of the payee were changed subsequent to their (plaintiffs') signatures being placed thereon, if so signed, which is denied; that plaintiffs were . . . ignorant and uneducated folk and unable to read very well and had

great confidence in and trusted said George W. Clinton as their friend and counselor in said matter of the borrowing of said money from him," and if they signed the notes they did so because said notes were represented as being for the actual amount of the loan "made to these plaintiffs by the said George W. Clinton and not by the said Joe Birnbaumer;" that they were unable to and did not read the deed of trust, but that it was represented to them by Clinton's son and by Clinton, in whom they had confidence, as securing the payment of "notes for $2000 and $500 only, as aforesaid;" that so believing they signed "a deed of trust" purporting to secure and which they were assured did secure only "their said notes for $2000 and $500 and interest at 8% per annum, which had theretofore been executed or were then or subsequently executed to and made payable to said George W. Clinton."

Then follow allegations to the effect that it was understood between plaintiffs and Clinton and Prewitt that the Prewitt deed of trust was to be a lien prior to that of Clinton (or Birnbaumer) and that it was left by Prewitt with Clinton to be filed for record, the latter agreeing to file it first so that it would appear of record as subject only to the Land Bank mortgage, which Clinton failed to do, and that the deed of trust here involved appears of record as a lien prior to Prewitt's, which conduct of Clinton in attempting to gain priority of lien "defrauded plaintiffs of their property" (but how it so operated is not alleged).

It is further alleged that defendants herein formed a conspiracy to defraud plaintiffs of their property and obtain it for themselves, and that pursuant to such conspiracy Spencer Salisbury falsely told plaintiffs that he had purchased the $2500 and $500 notes from the Clinton estate and demanded payment thereof, threatening foreclosure if they were not paid, and upon plaintiffs' failure to pay ordered the trustee to foreclose, which the latter did, the sale occurring on October 4, 1927, and that Spencer Salisbury bid in the property for $3800, and on October 11, 1927, the trustee made his deed conveying the property to defendants Spencer Salisbury and Mary Salisbury, though in fact the notes still belonged to the Clinton estate when foreclosure was so ordered.

It is next alleged that at the sale Prewitt announced in the presence of bidders that his deed of trust was prior to that under which the sale was being made and that defendants and the trustee knew that plaintiffs claimed they had not executed the two notes secured by the deed of trust being foreclosed and knew that the foreclosure had not been ordered by the real owner of said notes, but nevertheless proceeded with the sale; that prospective bidders, not knowing "what constituted liens against the property, or which, if any, were prior to others or whether said sale was lawful or not,"

were thereby deterred from bidding, by reason whereof the property sold for an inadequate price, by reason whereof "plaintiffs were defrauded" and the sale and trustee's deed were invalid; that at and prior to the foreclosure sale defendants knew all the facts and knew that plaintiffs did not owe the amounts claimed to be due on the notes; that if Spencer Salisbury had any title to the notes and deed of trust it was acquired on October 10, 1927 (after the foreclosure sale), by a contract of purchase that day made with Rose M. Clinton, administratrix of the George Clinton estate, but that Salisbury paid nothing therefor, nor on the purchase of the land at the foreclosure, and that the alleged purchase of the notes by Salisbury was "but a part of the aforesaid scheme and plan to defraud plaintiffs" and to acquire title to the property.

It is then alleged that "if the aforesaid notes . . . and deed of trust . . . were executed and delivered by these plaintiffs (which is denied), the said George W. Clinton caused and procured the plaintiffs to make and execute the same," and that they were so drafted as to require the payment of $3,000, but that all thereof in excess of $1625 with interest thereon was without consideration, fictitious and usurious; that plaintiffs when they executed the deed of trust "(if they executed the same, which is denied)" did not know they were executing instruments obligating them to pay usurious interest.

Plaintiffs further allege that they are without means other than said property and cannot pay into court what they owe, but ask that the amount be ascertained, and aver that if that is done they can and will "finance the property" and procure a loan with which to make payment; that they are willing to pay the amount the court may find to be owing by them.

There is a further allegation relative to a corn crop that was unmatured on the land at the time of the foreclosure and was later harvested by the Salisburys, the value of which plaintiffs seek to recover.

The prayer of the petition asks cancellation of both notes and of the deed of trust, that the trustee's sale and deed be set aside and for naught held, that the court ascertain the amount owing by plaintiffs, that the title to the real estate be vested in plaintiffs, that they be decreed the owners of said corn crop and entitled to its proceeds, and for general relief.

Defendant Rose M. Clinton answered separately admitting the death of her husband, her appointment as his administratrix, that he owned the notes at his death and that she sold them to her codefendant Salisbury (not stating when) and denies the charges of fraud.

The Salisburys answered jointly at great length. It will suffice to say that their answer admits certain uncontroverted facts and sufficiently joins issue with the allegations of the petition designed to charge fraud, misrepresentation, conspiracy, usury, etc. It should be stated, however, that they averred that since purchasing at the trustee's sale they had paid certain sums for taxes and insurance premiums on the property and to the Land Bank on its loan. By cross-petition they ask that title to the real estate involved be determined and quieted in them, to which cross-petition plaintiffs replied, repleading by reference the allegations of their petition.

The trial court did not make a specific finding of facts. The judgment recites generally that the court "finds the issues for the plaintiffs and against the defendants on the plaintiffs' petition and on the defendants' cross petition" and proceeds to adjudge: That the notice of trustee's sale, the sale and the trustee's deed (describing them in detail) be set aside and for naught held; that the two payments totaling $378.75 credited on the $500 note be applied as credits on the $2500 note; that the deed of trust (describing it) "constitutes a lien upon said real property to secure the payment of the note therein described for twenty-five hundred dollars . . . and interest thereon less the aforesaid credits by this decree made thereon, to-wit, $378.75, but does not constitute a lien upon said property to secure the payment of the note therein described for five hundred dollars;" that the deed of trust also constituted a lien on the property for the items (naming them) paid by the Salisburys for taxes, insurance and to the Land Bank since the foreclosure, with interest thereon; that plaintiffs have and recover from defendants the proceeds realized from the 1927 corn crop "raised upon and gathered from the above described premises and sold by defendants in the sum of $293.80, but that defendants take nothing by their cross-petition," and that plaintiffs recover costs.

The judgment does not purport to cancel the $500 note, but as to it only decrees that it is not secured by the deed of trust.

At the trial it was admitted, plaintiffs' counsel dictating the admission, that plaintiffs owned the lands on the dates of the deeds of trust referred to, and that Burrus as trustee in the one in controversy sold the lands on October 4, 1927, after advertisement (the sufficiency of which is not challenged); that George W. Clinton died and Rose M. Clinton was appointed his administratrix in February, 1924, and inventoried the two notes in question as assets of his estate, and that she was still such administratrix, and that on October 10, 1927, "there was a contract or agreement entered into in writing between Rose M. Clinton, administratrix of the estate of George W. Clinton, and Spencer Salisbury, whereby Rose M. Clinton sold these notes to Spencer Salisbury."

It was admitted by defendants' pleading that the Clinton estate owned the notes when the foreclosure of the deed of trust was ordered and held. It was shown and not disputed that the notes were endorsed by the payee, Joe Birnbaumer, but when that was done does not appear. There was no evidence tending to show that there was no such person as Birnbaumer.

It may be well to state here, also, that while plaintiffs say at one place in their petition that the trustee knew when making the sale that plaintiffs claimed they had not executed the notes and also knew that the sale had not been ordered by the real owner of the notes, there is no evidence in the record to justify that claim, and moreover, if plaintiffs meant thereby to charge the trustee with unfaithfulness to his trust, they virtually withdrew the charge at the trial. Plaintiffs were offering evidence relative to Prewitt's contention and announcement at the sale that his deed of trust was prior to that being forcelosed. Defendants objected on the ground that if the trustee was to be accused of misconduct he should have been made a party to the suit. Plaintiffs' counsel stated: ''We are not complaining of the trustee at all;'' and again: ''. . . I don't make any (accusations) against the trustee.'' It may be taken as conceded that there was no fraud, oppression or unfairness on the part of the trustee.

I. Plaintiffs' case rests mainly on the testimony of plaintiff Thomas Webb, and so far as concerns the transactions relative to the giving of the notes and deed of trust his chief complaint, practically his only complaint, was as to the $2500 note. Plaintiffs' contention in their petition and in the trial was that the debt represented by the notes and deed of trust was a loan by Clinton to plaintiffs, not a loan secured for them by Clinton from Birnbaumer. On that theory, Clinton being dead; Webb was precluded by the court's rulings on defendants' objections from testifying about the transaction between himself and Clinton, and as Webb had acted in that matter for himself and his wife there was no testimony from her as to what the agreement with Clinton was. Webb was, however, permitted to state that he borrowed $2,000 (and no more) from Clinton, and his chief contention seemed to be that when he signed the $2500 note (if he signed it) he thought it was for $2,000. He offered no evidence to prove that Clinton retained any part of the $2,000.

In this connection it should be stated that it appears from the evidence that at the time of the transaction in question plaintiffs were obtaining the $6500 loan from the Land Bank to pay a then existing encumbrance on the land largely in excess of said sum procured from the Land Bank. The amount of such encumbrance is not shown, but

it is clear that it was more than $8500, probably more than $9,000. The Land Bank loan had to be secured by first mortgage, therefore plaintiffs had to procure money additional to the $6500 loaned by the Land Bank.

As stated, Webb testified that he only needed and only borrowed from Clinton $2,000. Relative to signing the notes and deed of trust he said that Clinton ''drawed up this $2,000 note'' in his office and later Clinton, with his son Thomas, came to plaintiffs' home with the papers, finding plaintiff in the wheat field. He testified: '' . . . and Tommy (Clinton) brought the note over in the wheat field where I was cutting wheat . . . It was dark then . . . and he said, 'Tom, I brought these notes down here for you to sign.' I said, 'Allright, Tommy, I'll turn the team around and I will sign them and you can go on back'—it was dark—Well, I signed, he brought out the notes and I turned the binder around and got down on my knees on the platform of the binder and laid the note down on the binder. I said: 'Tommy, this is a note they drawed up there the other day;' he said, 'Yes, sir:' I said, 'Read it,' and he read me the note made to George W. Clinton for $2,000.'' That Tommy then struck and held a match by the light of which, he, Webb, signed the note, and that at the same time Tommy produced and he signed the deed of trust, but to the best of his recollection those were all the papers he signed that day.

Thomas Clinton, for defendants, positively denied the above testimony of Webb. He testified that his father went with the papers to the place where Webb was at work in the field and that he, Thomas, did not go and was not present when the signing occurred. Mrs. Webb signed the papers at the house after her husband had signed.

As to the $500 note, Webb testified that he thought it was signed at Clinton's office a day or so later when they returned from a visit to the Land Bank. This was also Mrs. Webb's testimony.

While Webb stated once or twice in his testimony that he did not think he signed the $2500 note and intimated that if he did it must have been altered subsequently as to amount and name of payee, his testimony as a whole virtually admits that the signature thereto is his and there is no evidence from which it could be found that the note had been altered after it was signed. It is apparent from his testimony that his real reason for claiming that he did not sign the $2500 note was his belief. (if he believed it) that he only borrowed $2,000, a belief in which he was mistaken as his own evidence shows. He was asked by his counsel: ''Now, why do you say it (the note) was for $2,000? A. Well, that is all I borrowed from him. Q. You are not denying that you signed this paper, are you? A. I signed the note after dark. I told you twice.''

And near the close of his testimony he said in answer to his own counsel that he did not claim that he knew exactly what he signed that night; "I would not swear to it, for I just trusted to that boy's honesty and I signed the note."

He claimed that he only needed and only borrowed from Clinton $2,000. Plaintiffs' own evidence, however, in the form of a letter and receipt from the Land Bank and records of Clinton's bank account and a check or draft to the Land Bank, shows conclusively that Clinton paid to the Land Bank for Webb, $2500 for use in paying off the former incumbrance on the land above referred to. That plaintiffs thus received $2500 instead of $2,000 is beyond question.

The trial court's judgment, from which plaintiffs did not appeal, was against plaintiffs' contentions relative to the $2500 note, notwithstanding the prefatory statement that the court "finds the issues for the plaintiffs," because it adjudges that the deed of trust is a lien securing that note in full, less the credits. The court could hardly have found otherwise under the evidence.

II. We are somewhat at a loss, however, to understand why the court adjudged the $500 note  not secured by the deed of trust, though refraining from declaring it invalid and canceling it as plaintiffs had prayed. The judgment seems to leave the note as a valid obligation of plaintiffs, but strikes down its security. If valid, why did not the deed of trust secure it as that instrument expressly provided? It is true that Webb at one time when asked by his attorney when he signed the $500 note said: "Well, I don't think we signed this $500 note until after we came back from the bank, me and the woman went in and we signed this $500 note in the office, it never was put in the deed of trust, this commission note." Defendants objected to that statement "because the record shows whether it is in the deed of trust or not," and the court remarked: "The record shows." There was also some intimation that there may have been two $500 notes signed, but it could hardly be said to rise to the dignity of evidence. Plaintiffs stated in their petition that they signed a deed of trust purporting to secure and which they believed did secure *their* notes for $2,000 and $500, "which had theretofore been executed or were then *or subsequently* executed," etc. Except for the vague and shadowy evidence (?) above noted there was no attempt to claim at the trial that plaintiffs did not sign the $500 note described in the deed of trust, nor that the $500 note therein described was not the one intended to be secured thereby, and the evidence as a whole, as well as plaintiffs' pleading, leaves no room for doubt on that point. Plaintiffs' whole attack

upon the $500 note described in the deed of trust was upon the theory that it was without consideration and usurious.

There was in fact no evidence as to the consideration for the $500 note unless by inference. It was referred to several times by Webb as a commission note, but as he could not testify about the transaction with Clinton the agreement between them relative to that note is left in the dark. Webb's testimony shows that Clinton transacted for him the business with the Land Bank in procuring the loan from that bank, and incidentally thereto discharging the prior encumbrance. There is evidence from which it may. be inferred that the $2500 paid by Clinton for Webb to the Land Bank for use in discharging the prior encumbrance was Clinton's money rather than a loan procured from Birnbaumer, thus: The notes and deed of trust in controversy are dated July 2, 1923. The records of the bank at which Clinton did business show that on July 11, Clinton borrowed there $2,000 which, with two other items, the three aggregating $2744.56, he that day deposited and on the same day drew his check for $2500 which was sent to the Land Bank. It is not shown whether he paid out other money on account of that transaction or not. But assuming that he did not and that he was loaning his own money to plaintiffs, the $500 note may have been for commission and services in procuring for plaintiffs the loan from the Land Bank and in connection with getting the prior encumbrance paid and satisfied of record, rather than a "commission" for loaning his own money. The note purports a valid consideration. It devolved upon plaintiffs to sustain by evidence their charge that it was without such consideration. Conjecture or suspicion is not sufficient. We think the evidence insufficient to justify a finding that the $500 was invalid or that it was not secured by the deed of trust.

It is also worthy of note in this connection that Burrus, the trustee, called as a witness by defendants, testified that prior to the sale Webb and two of his sons called at Burrus's office and asked to see the two notes which were then in Burrus's possession; that Burrus showed them to Webb and Webb figured up the interest, remarked that it was a lot of money but gave no intimation that he did not owe both notes and said he would get the money to pay them; and that Webb, though again on the witness stand, did not deny that testimony, nor were his sons called as witnesses.

III. Plaintiffs' contention that Prewitt's announced claim at the sale that his lien was prior to the deed of trust then being foreclosed prejudiced them and invalidated the sale cannot be sustained. The trustee was in no wise responsible for the controversy as to priority between the respective lienholders. The deed of trust he was foreclosing appeared of record prior to Prewitt's. He is not shown to have had any

knowledge as to which was in fact prior and was simply performing his duty in advertising and offering the property for sale according to the terms of the instrument by virtue of which he was acting. But assuming that circumstances might arise such that without fault of the trustee or of debtor or creditor a controversy of the character indicated would prevent a fair sale and justify relief by a court of equity, no such circumstances are here shown. Plaintiffs contended both in their petition and at the trial that the claim of Prewitt that his was the prior lien was true. They could not therefore have been prejudiced thereby. When the announcement was made the trustee said nothing further but proceeded to sell. If prospective bidders believed Prewitt's claim it was, according to plaintiffs, in keeping with the facts. On the other hand, if they relied on the record which showed the deed of trust being foreclosed to be the prior lien, such belief would have tended to induce higher bids, to plaintiffs' advantage. And further, no evidence was offered to show that any prospective bidder was deterred from bidding by reason of the announcement or because of the alleged controversy. We are unable to see how plaintiffs could have been prejudiced by that occurrence.

IV. Plaintiffs alleged in their petition and urge here that the sale and trustee's deed were void because the sale was not ordered by the legal holder of the notes, but by Salisbury who was not then  the owner. We need not notice the authorities cited in support of that contention, because we find that the evidence does not support plaintiffs' claim. The trustee's deed recites that the foreclosure was at the request of the legal owner and holder of the notes secured by the deed of trust and by the terms of the instrument such recital in the trustee's deed is prima-facie evidence of the fact. [Hurst, etc., Co. v. Trust Co., 216 S. W. 954, 958.] Plaintiffs' evidence to the contrary consisted of Webb's testimony to the effect that shortly prior to the advertisement Salisbury called upon him for payment, though not exhibiting the notes, and said that he had bought and then owned them; and the testimony of Webb and several other witnesses to the effect that Salisbury had said after the sale that he owned the notes prior to the sale and that he had ordered the sale. Salisbury denied having made these statements. They were said to have been made at the hearing of an unlawful detainer suit brought by Salisbury after he received the trustee's deed, at which hearing there seems to have been more or less disagreement and argument among the lawyers, and Salisbury had testified "what little you let me." At that time he had bought the

notes. The witnesses who testified to his alleged statements may have misunderstood him as to *when* he bought them. He testified that prior to the foreclosure he had tried to collect the notes for Mrs. Clinton at her request and at one time told Webb "he would have to deal with me and not bother Mrs. Clinton, she instructed me to do that," but did not tell Webb whether he was the owner of the notes or merely collecting them.

Salisbury further testified that he did not order the foreclosure. Asked by plaintiffs' counsel if he told Burrus to put the advertisement in the paper, he answered: "No, Mrs. Clinton told him to put that in." But on plaintiffs' motion (no ground stated) the court struck out the answer.

Burrus, the trustee, was called as a witness by defendants. He testified that he advertised the property for sale; that before doing so the notes and deed of trust were turned over to him by Mrs. Clinton at her office in the presence of Thomas Clinton, James Clinton and Spencer Salisbury. Defendants then sought to prove by the witness that Mrs. Clinton, when she handed him the papers, gave him certain instructions and what the instructions were, to which plaintiffs objected as being hearsay. Defendants then made a formal offer of proof, as follows: "I offer to prove by this witness that if permitted to testify, he would state that he was trustee under this deed of trust, and that Mrs. Clinton, administratrix, and holder of these notes, gave them to him with instructions to bring foreclosure proceedings." Plaintiffs objected to his testimony as to what instructions Mrs. Clinton gave him because hearsay, which objection was sustained and the witness was not permitted to state. Defendants called Thomas and James Clinton, sons of Mrs. Clinton, and Salisbury who were present on that occasion and by each offered to prove that when Mrs. Clinton handed Burrus the notes and deed of trust she directed him to foreclose the latter, which offered testimony was excluded on plaintiffs' objection that it was hearsay. Mrs. Clinton was not present at the trial, being then in Florida, so could not be called as a witness.

The evidence offered to prove that the administratrix, the then holder of the notes, directed the trustee to foreclose the deed of trust was not hearsay and should have been admitted. It was not an offer to prove that Mrs. Clinton *had said* in the presence of the witnesses that she had ordered the sale, or anything of that kind, but an offer to prove *the fact* that she did order it—a material fact—by witnesses who had heard the order given, one being the trustee to whom it was given, and the offered testimony was direct evidence of the fact sought to be proved. The court indicated, in ruling upon an objection of plaintiffs, that he considered such evidence hearsay because

Mrs. Clinton's request to the trustee was not made in the presence of the plaintiffs. On that theory Mrs. Clinton herself could not have testified that she ordered the sale and there would be no way in which the fact could be proved. [See Edge v. Southwest Missouri Electric Ry. Co., 206 Mo. 471, 499, 104 S. W. 90.]

The question arises whether, this being an equity case in which we are not bound by the trial court's findings of facts, we may consider the evidence erroneously excluded by the trial court. This court has frequently held that it will do so when such evidence is preserved in the record. In Hanson v. Neal, 215 Mo. 256, 271, 114 S. W. 1073, it is said that ". . . the exclusion or admission of testimony is rarely reversible error in chancery on appeal. The testimony being here, we can seek equity and do it by considering competent proof offered and excluded, or rejecting incompetent proof objected to and received." [See also Rinkel v. Lubke, 246 Mo. 377, 392, 152 S. W. 81, 86; Jones v. Thomas, 218 Mo. 508, 544, 117 S. W. 1177; Goodrick v. Harrison, 130 Mo. 263, 269, 32 S. W. 661; Lindhorst v. St. Louis Prot. Orphan Asylum, 231 Mo. 379, 389, 132 S. W. 666.]

Many other cases to the same effect might be cited. In most of them this court reached the conclusion that, although the excluded evidence be taken into consideration, the judgment of the lower court was right. But in Rice v. Shipley, 159 Mo. 399, 60 S. W. 740, certain depositions had been erroneously excluded and this court, considering them with the admitted evidence, reversed the judgment with directions to the trial court to enter judgment for the opposite party on one count of the petition. The depositions were preserved in the record so that this court had the witnesses' testimony before it.

In Thompson v. Pinnell, 237 Mo. 545, 141 S. W. 605, this court reversed and remanded for new trial in an equity case because competent evidence had been erroneously excluded. We think, however, that the excluded evidence did not appear with entire clarity in the record.

In order that we may consider evidence excluded by the trial court, it is necessary that we know accurately, from the record, just what the excluded evidence was. In this case we have before us the excluded testimony of two of the witnesses by whom defendants offered to prove that the administratrix ordered the sale. As stated above, Salisbury testified in answer to a question as to whether he told Burrus to put the notice in the newspaper: "No, Mrs. Clinton told him to put that in." Thomas Clinton, son of the administratrix, was asked if he was present when his mother instructed the trustee "to make this sale" and answered: "I was." Plaintiffs then objected and the objection was sustained, but the record shows what

the testimony was. The offer of proof by the trustee and by James Clinton, who was present when Mrs. Clinton handed the papers to Burrus, shows clearly just what the offered proof was.

Respondents in effect invite us to consider said excluded testimony if in our opinion it should have been admitted. In their brief here they say, referring to appellants' contention that the court erroneously rejected the evidence, ". . . the appellate court will consider if competent though erroneously rejected," citing Rinkel v. Lubke and Lindhorst v. Orphan Asylum, supra.

Mrs. Clinton, as administratrix, was the owner and holder of the notes. She had delivered them and the deed of trust to the trustee. She knew he had advertised the property and she attended the sale. Salisbury testified that he bid in the property for her. In her contract with Salisbury of October 10, in selling him the notes she stipulated that he should pay the costs of the foreclosure in addition to the sum paid the estate, evidently recognizing that otherwise she, as administratrix, would have to pay those costs.

We are strongly inclined to think that even without consideration of the testimony above referred to, rejected by the trial court, the evidence in the case would not justify a finding that Mrs. Clinton, administratrix, did not order the sale. And in view of all the circumstances we feel justified in taking that testimony into consideration.

Upon this record we are clearly of the opinion that the judgment setting aside the trustee's sale and deed is not sustainable on the ground that the sale was not ordered by the legal owner and holder of the notes secured by the deed of trust.

V. Respondents suggest in their brief that the sale of the notes by the administratrix to Salisbury was not legally authorized by the probate court. That question was not a contested issue below. Plaintiffs admitted at the beginning of the trial that on October 10 the administratrix made a contract with Salisbury whereby she sold him the notes. They introduced (for the purpose of showing that Salisbury did not own the notes at the time of the sale) a copy of the contract certified by the clerk of the probate court, which clerk's certificate refers to the contract as having been approved by the court and being of record in that office. The contract is definite as to terms and manner of sale. At no stage of the trial was any question raised as to the sufficiency of the probate court's record to authorize the sale. In those circumstances and in view of plaintiffs' admission, defendants were not called upon to make further showing of the validity of the administratrix's sale of the notes to Salisbury.

VI. Plaintiffs pleaded that Salisbury did not pay anything on his bid nor for the notes, and they still insist he did not pay his bid. The facts shown by the record are these: He paid the administratrix $3200 for the notes plus the costs of foreclosure. His explanation of Mrs. Clinton's willingness to take $3200 net to the estate and the probate court's approval of that sale was that he had bid at the sale for Mrs. Clinton (whether as administratrix or individually he did not state) and that a controversy with Prewitt was feared because of his and plaintiffs' claim that Prewitt's lien was prior to that under which the sale was made, and Mrs. Clinton wanted to get the estate settled. Prewitt was claiming a lien for items in addition to the face of his note and interest aggregating in all about $1800.

Salisbury testified that his bid for Mrs. Clinton, $3800, was the amount due on the notes and the costs. That was not disputed. The full amount of the bid, less costs of foreclosure, was by the trustee credited as payment of principal and interest on the notes on October 11, whereupon he executed and delivered his deed, and as we understand the record it was admitted that the notes were then surrendered to plaintiffs. They were in plaintiffs' possession at the trial and by them offered in evidence. Plaintiffs got the full benefit of Salisbury's bid of $3800. If the Clinton estate suffered we cannot see how that affects plaintiffs. Whether the transaction between the administratrix and Salisbury after the sale be regarded as a sale of the notes or debt evidenced thereby to Salisbury, or as an assignment to Salisbury of Mrs. Clinton's right to take the deed from the trustee on payment of the amount bid, plaintiffs' debt to the full amount of the bid, less foreclosure costs, is paid.

VII. Plaintiffs also contended that the land sold at an inadequate price, wherefore the sale should be set aside. They introduced evidence tending to show that the reasonable market value of the land was about $125 per acre, or $15,000. There was a prior mortgage of $6500 which with the amount bid made the sale price $10,300. If, as plaintiffs and Prewitt claimed, the latter's deed of trust was a prior lien, there must be added at least $800 with several years accumulated interest. Absent some element of fraud, oppression or unfairness in the sale, of which we find no evidence, there was no such inadequacy of price as would justify a court of equity in setting aside the sale on that ground. [See Lipscomb v. N. Y. Life Ins. Co., 138 Mo. 17, 29 S. W. 465; Phoenix Trust Co. v. Holt, 312 Mo. 563, 279 S. W. 714; East Ark. Lumber Co. v. Rainer & Connell Cotton Co. et al. (Mo.), 24 S. W. (2d) 1001 and cases cited.]

**1142**

VIII. Plaintiffs also asserted in their petition (chiefly as conclusions) and insist here that defendants conspired to defraud them and obtain the property wrongfully. We find no evidence of such alleged conspiracy or of wrongful acts on the part of defendants. Salisbury had tried, for Mrs. Clinton as he claims, to collect the notes. Whether or not he told Webb that he owned the notes, Webb did not pay nor offer to pay to him. Mrs. Clinton had previously tried unsuccessfully to collect. Plaintiffs had been notified that unless payment was made the deed of trust would be foreclosed. Webb testified he talked with Mrs. Clinton a few days before the land was advertised, after he had a talk with Salisbury, and told her that he had some hogs and corn and could pay "part of that," but could not pay $2500, for he didn't owe it. He at no time in his testimony claimed that uncertainty as to who owned the notes had anything to do with his failure to pay. Plaintiffs knew of the advertisement from its inception. Webb was present at the sale and does not claim that he made any protest. He had tried prior to the foreclosure to obtain a new loan (for enough, by the way, to have paid this debt in full) and had been unable to do so; a situation with which we sympathize, but because of which, alone, we cannot grant the relief prayed. The fact clearly appears that plaintiffs' failure to pay and the consequent foreclosure were in no way due to misunderstanding or uncertainty as to whom payment should be made or to any wrongful acts of defendants.

IX. Appellants contend that the petition was insufficient because the trustee was not made a party. If there was a defect of parties, which we need not decide, it was waived by defendants' failure to raise the point by demurrer or answer. [Sec. 774, R. S. 1929.] They urge other matters, such as that no tender was made of the amount admitted to be due and that relief from usury should be sought at law rather than in a court of equity; matters which we refrain from discussing because the conclusion we have reached renders it unnecessary.

We have considered the evidence thoroughly and, treating plaintiffs' petition as stating a cause of action which entitles them to relief if the facts alleged were proved, we are convinced that the evidence does not sustain the trial court's judgment, nor entitle plaintiffs to any of the relief sought. We think under the evidence that the trustee's sale and deed were valid. Being a valid conveyance of the land that deed also passed title to the ungathered crop of corn then standing and unmatured, as we understand the record, on the land.

The judgment of the circuit court is reversed and the cause remanded with directions to that court to dismiss plaintiffs' bill and to enter judgment for defendants Spencer Salisbury and Mary Salisbury on their cross-petition, quieting title in them to the said lands conveyed to them by the trustee's deed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.